SUPREME LODGE K. OF P. *v.* LAMALTA.

(*Jackson.*　　June 15, 1895.)

1. BENEVOLENT SOCIETIES. *Laws of, constitute part of contract with member.*

Doctrine reaffirmed that the laws of a benevolent society, when pertinent, and not in conflict with the statute laws or the recognized rules of public policy, become part of its contracts with its members. (*Post, p. 160.*)

Cases cited and approved: Tennessee Lodge *v.* Ladd, 5 Lea, 720; Catholic Knights *v.* Kuhn, 91 Tenn.. 216.

2. SAME. *Anti-suicide law passed after application for membership.*

A valid law passed by a benevolent society after the filing of an application for membership and issuance of a certificate, and before the death of the member, is operative against him and his beneficiaries to defeat their rights, where, in his application, he agreed to conform to the rules now in force or which may "hereafter be enacted," and such obedience is made a condition of the issuance of the certificate. (*Post, pp. 160, 161.*)

Case cited and approved: 71 Ala., 436.

3. SAME. *New constitution supersedes old one.*

The constitution of a mutual benefit society is entirely superseded by the adoption of another constitution, except as to the parts which are reproduced in the new constitution. (*Post, p. 167.*)

4. SAME. *Powers of boards of control.*

The board of control of the endowment rank of a mutual benefit society has no power to pass a law that payment will not be made on the certificates of members who commit suicide, under a provision in the constitution that such board shall have "entire charge and full control of the endowment rank," subject to such restrictions as the Supreme Lodge may provide. This language imports executive, not legislative, functions. (*Post, pp. 167, 168.*)

Supreme Lodge K. of P. *v.* LaMalta.

5. SAME.   *Delegation of powers to boards of control.*

  The Supreme Lodge of a mutual benefit society, in which is
   vested, by the charter, the sole power to legislate with respect
   to the endowment rank of such society, cannot legally dele-
   gate to a board of control the power to pass a general law
   against suicide effecting the entire endowment rank. (*Post,
   pp. 169, 170.*)

### FROM SHELBY.

Appeal in error from Circuit Court of Shelby
County.   L. H. ESTES, Judge.

F. P. POSTON for Supreme Lodge.

SMITH & TREZEVANT for LaMalta.

CALDWELL, J.   On the fourteenth day of May,
1889, the Supreme Lodge Knights of Pythias of the
World issued to Frederick Schuman, of Memphis,
Tennessee, a "certificate of membership" in the en-
dowment rank of that order, whereby it bound it-
self to pay to his children, Lotta S. and Frederick
E. Schuman, the sum of $3,000 upon his death in
good standing.

The children so named as beneficiaries died on the
thirtieth of January, 1893, and Schuman himself
died the next day.   By the terms of the certificate
and the laws of the order, all interest of the chil-
dren ceased and determined upon, and in consequence
of, their death in the father's lifetime, and upon his

death without having nominated some other benefi-ciary, all rights under the certificate passed to his next of kin and legatees under his will.

Upon refusal to pay, Frederick Schuman's execu-trix and next of kin brought this suit in the Cir-cuit Court of Shelby County to recover from the Supreme Lodge Knights of Pythias the full sum named in the certificate. Verdict was returned and judgment pronounced in favor of the plaintiffs, and the defendant appealed in error.

The only real defense made in the Court below, was that Schuman, the assured, took his own life, and thereby, under the laws of the order, forfeited and annulled his certificate of membership and ab-solved the defendant from all obligations to pay the same; and the rulings of the trial Judge, in his charge as given and in his refusal to instruct the jury as requested, upon the question of suicide, are, in this Court, assigned as error.

It was admitted on the trial in the Court below, "that on the morning of the thirtieth of January, 1893, the two children of Fred Schuman were found in bed with him, dead, and that he was then insen-sible, and died on the thirty-first of January, 1893, and that his death and that of his children was caused by opium or morphine, given by him to the children, and taken by himself." It was also ad-mitted that "Fred Schuman was much attached to these children, and treated them very tenderly," that he died in good standing, and that payment of his

certificate was refused alone upon the ground that he "committed suicide."

The order of Knights of Pythias is not a regular life insurance company, but it is a benevolent association, with life insurance as one feature, to be enjoyed or not by each particular member, at his own election and upon certain terms and conditions.

The laws of this order, as of other benevolent associations, when applicable, and not in conflict with Federal and State laws or contrary to public policy, are to be taken as parts of its contracts with its members, and, as such, are of great moment in the determination and enforcement of their respective rights and obligations under those contracts. Bacon's Benefit Societies and Life Insurance, §§ 161, 185; *Tennessee Lodge* v. *Ladd*, 5 Lea, 720, 721; *Catholic Knights* v. *Kuhn*, 91 Tenn., 216.

At the time Schuman applied for and obtained the certificate in suit, the order of Knights of Pythias had no law against suicide. But the defendant insists that such a law was enacted before his death, and that it became binding upon him at once, and upon those who should claim under him.

His written application for membership in the endowment rank contains this statement: "I hereby agree to conform to and obey the laws, rules, and regulations of the order governing this rank, now in force, or that may hereafter be enacted, or submit to the penalties therein contained;" and the certificate of membership recites upon its face that

the consideration upon which it is issued, is, among other things, "the full compliance," by Schuman, "with all the laws governing this rank, now in force, or that may hereafter be enacted."

These stipulations in the application and certificate were binding upon Schuman while he lived, and they are equally binding upon the plaintiffs since his death; and, in consequence thereof, the anti-suicide law, relied upon as a defense to this action, though enacted subsequent to the filing of the application and issuance of the certificate, became operative against him and them from the time it was passed, provided, only, that its passage was accomplished in such a manner as to make it a valid law of the order. *Sup. Commandery v. Ainsworth*, 71 Ala., 436.

The law in question was passed by the "Board of Control of the Endowment Rank, Knights of Pythias," in regular quarterly session, on January 12 and 13, 1893, as an amendment to article six, § 1, of the "General Laws" of said rank; and it is as follows: "If the death of any member of the endowment rank heretofore admitted into the first, second, third, or fourth classes, or hereafter admitted, shall result from self-destruction, either voluntary or involuntary, whether such member shall be sane or insane at the time, or if such death shall be caused or superinduced by the use of intoxicating liquors, narcotics or opiates, or in consequence of a duel, or at the hands of justice, or in violation, or attempted violation, of any criminal law, then, in such case,

the certificate issued to such member, and all claims against said endowment rank on account of such membership, shall be forfeited."

Had the "Board of Control" legal authority and power to pass such a law? His Honor, the trial Judge, instructed the jury, in effect, that it had not, and that, for that reason, the supposed law was invalid, and without force or virtue in this case; and, entertaining that opinion, he also refused to instruct the jury, upon the request of the defendant, that such law was operative against the plaintiffs, and, upon the admitted facts, a complete answer and bar to their action.

Undoubtedly, such a provision against self-destruction is reasonable, and, being so, it is, as previously stated herein, binding upon Schuman and upon those claiming under him, if validly enacted. The fact that its enactment was subsequent to the date of his certificate is rendered unimportant by the stipulations in the application and in the certificate itself, whereby he bound himself irrevocably to full obedience and submission to all legislation then in existence or thereafter enacted for the government of the endowment rank, of which he was becoming a member. Those stipulations, however, though in the broadest terms, must be construed as relating to and embracing only such laws as the order had the legal right to make, and as it should make in a legal and binding form.

The Supreme Lodge Knights of Pythias of the World was incorporated, under an Act of the Con-

gress of the United States, August 5, 1870. As then existing, the fundamental and general laws of the order contemplated one Supreme Lodge for all its membership in the world, one Grand Lodge for each State and Territory of the Union, etc., and subordinate lodges for different towns and cities in those States, etc. All the powers of grand and subordinate lodges emanated from the Supreme Lodge.

The grades of membership, or of advancement in the subordinate lodges are three in number, called "Ranks;" and a member of the first rank is designated as a "Page;" of the second rank, as an "Esquire," and of the third rank, as a "Knight."

Representatives from all the subordinate lodges of any given State or Territory compose the Grand Lodge of that particular jurisdiction, and representatives from all the Grand Lodges make up the membership of the Supreme Lodge.

By the ninth and last section of its charter, obtained in 1870, the Supreme Lodge was granted ample "power to alter and amend its constitution and by-laws at will."

Through an amendatory act of incorporation, obtained October 5, 1875, the charter of 1870 was changed in many particulars. One change was the complete annullment of § 5, and another was the appropriate substitution and diminution of the numbers of all succeeding sections until § 9 of the charter of 1870 became § 8 of the amended charter of 1875. The other amendments have no relation to the sub-

ject now under consideration, and, hence, will not be stated.

On May 24, 1882, the charter of 1875 was amended, and among the changes made was the addition of a new section, at the end, as follows: "9. That the said Supreme Lodge shall have power to establish the 'Uniform Rank' and the 'Endowment Rank,' upon such terms and conditions, and governed by such rules and regulations, as to the said Supreme Lodge may seem proper."

This last amendment of its fundamental law undoubtedly conferred upon the Supreme Lodge plenary power to establish, maintain, and control the endowment rank (which was, in fact, established several years prior to 1882); and if, in the exercise of that power, that body had enacted the law invoked by the defendant in this case, there could be no serious question as to its validity.

But the truth is, that only the "Board of Control," and not the Supreme Lodge, passed that law. Had that Board tne requisite legal power for the enactment of such a law?

At its regular biennial session in April, 1884, the Supreme Lodge enacted a code of "General Laws," and adopted a "constitution for the government of sections of the endowment rank."

The endowment rank was not intended to be, and, under the power granted to the Supreme Lodge, could not have been, established as a separate organization, with full power to make its own laws.

. "Sections"' of the endowment rank are intimately related to and connected with subordinate lodges. Only members of subordinate lodges having obtained the rank of knight, and continuing in good standing as such, can have and maintain membership in "sections" of the endowment rank. The establishment of the endowment rank only introduced into the order of Knights of Pythias a means of mutual insurance among knights desiring such a benefit and willing to bear the additional burdens thereof. Knights are not all members of the endowment rank, but all members of the endowment rank must be knights.

By article six of the general laws, enacted by the Supreme Lodge in 1884, for the endowment rank, a "Board of Control" was created, with general powers of supervision of the business of that rank; and by article seven of those laws, as well as by article fifteen of the constitution adopted at the same time, the Supreme Lodge expressly reserved to itself full power of alteration and amendment of those laws and of that constitution at any regular session.

Amendments of both were made in 1886, and again in 1888. The constitution, as amended in the latter year, was very lengthy, and consisted of sixteen articles. Article eight comprised nineteen sections, relating especially to the "Board of Control"—its composition and powers. Section 5 is in these words: "The board shall have entire charge and full control of the endowment rank, subject to

such restrictions as the Supreme Lodge may, from time to time, provide."

Section 9 is as follows: "The board is hereby authorized to enact general laws, rules, and regulations in conformity with this constitution, for the government of sections and the membership of the endowment rank, and alter and amend such general laws, rules, and regulations, when, in their judgment, the needs of the rank require such action."

Here, for the first time, was it attempted to transfer the power of making laws for the endowment rank from the Supreme Lodge to the Board of Control; and this was done, not by an amendment of the charter of the Supreme Lodge, but only by legislation of the Supreme Lodge, passed in the ordinary way. That constitution continued in force until 1892, when the Supreme Lodge adopted another one, of only six articles, in its stead.

Section 5 of article eight of the constitution of 1888, as quoted above, became the fifth and last section of article one of the constitution of 1892, but section 9 of article eight of the constitution of 1888, *supra*, was entirely omitted from the constitution of 1892, and no like provision was substituted for it.

The constitution of 1892 was the one in force on the twelfth and thirteenth of January, 1893, when the Board of Control passed the anti-suicide law, interposed by the defendant in this case.

Henry B. Stolte, a member of the Board of Control at that time, testified in this case, and, among

other things, he said, in effect, that the said section 9 of article eight of the constitution of 1888 was still in force when the anti-suicide law was passed in January, 1893, but that is only the opinion of the witness upon a legal question. .

The constitution of 1892 was adopted, certified, and promulgated as the "Constitution of the Endowment Rank, Knights of Pythias of the World," and it was published by proper authority in pamphlets so entitled, as had been all former constitutions. Each of the instruments so adopted and promulgated was, for its time, the complete and only constitution of the endowment rank, and no part of a former constitution became a part of a later one unless embodied in it.

The constitution of 1892 was adopted, certified, promulgated and printed as one full and complete instrument, and as the only constitution of the endowment rank so long as it should remain unchanged by the Supreme Lodge. It superseded the constitution of 1888 entirely, and left only such parts of it in force as were reproduced in the new instrument. This follows as a matter of law.

No provision found in the constitution of 1892 conferred, or seems to have been intended to confer, upon the Board of Control power to make laws, as did section 9, article eight, of the constitution of 1888. Section 5, article one of the constitution of 1892, which is but a reproduction of section 5, article eight, constitution of 1888, did not bestow leg-

islative power, as is readily seen by reference to its terms, which are as follows: "The board shall have entire charge and full control of the endowment rank, subject to such restrictions as the Supreme Lodge may, from time .to time, provide." Obviously, this provision relates alone to the administration of laws, and not to the enactment of them. The words "entire charge and full control," as there employed, import. executive rather than legislative functions.

Section 9 of article eight of the constitution of 1888, whose terms were unmistakable and ample in scope for the purpose contemplated, contained the only provision to be found in any constitution of the endowment rank, or elsewhere, intended to author-ize the Board of Control to pass general laws for that rank; and it is evident that the members of that board believed that provision to be still in force, and that they thought they were acting under its authority when they passed the law involved in this case.

As has already been observed, however, that pro-vision ceased to exist, and had no further force or vitality, when it was omitted from the constitution of 1892, which completely superseded the constitution of 1888 with all of its provisions.

It follows that the Board of Control was without even the appearance of the requisite legislative power when it passed that law in January, 1893, and, con-sequently, that the law was invalid *ab initio*. Even

the authority granted by the Supreme Lodge to en-
act laws had been withdrawn from the board.

But, if it were conceded that the witness, Stolte,
and the other members of the Board of Control
were right in their belief that the ninth section of
article eight of the constitution of 1888 was of the
same virtue after, as before, the adoption of the
constitution of 1892, the result in this case would
be the same, because the Supreme Lodge had no
power to confer general legislative functions upon
the Board of Control, and its effort to do so was
ineffectual and void. Section 9 of article eight of
the constitution of 1888, whereby the Supreme Lodge
attempted, in plain and comprehensive language, to
clothe the Board of Control with authority to enact
general laws, was itself *ultra vires*, and without legal
efficacy; and, if embodied in the constitution of 1892,
it would have afforded no legal authority for the
passage of the anti-suicide law.

The ninth section of the second amended charter
of the Supreme Lodge vested in that body alone
the power to legislate with respect to the endow-
ment rank; and the Supreme Lodge could not legally
delegate that power to another.

That provision of the fundamental law fully au-
thorized the Supreme Lodge to enact all such reason-
able laws as it might deem proper for the estab-
lishment and government of the endowment rank;
and, in the exercise of that broad authority, it might
well create a Board of Control, or any other like

agency, for the management of the business of that rank, but it could not abdicate its high position and transfer its lawmaking power to such board, or other agency.

Though the Supreme Lodge may have had the fullest power, under its charter, to pass the law in question in this case, as we think it had, we have no hesitation · in holding that it could not bestow such power upon the Board of Control. Under the existing charter, a general law of that character could be passed by the Supreme Lodge alone.

We do not hold that the Supreme Lodge may not lawfully authorize subordinate lodges and sections to pass by-laws for their local government, nor that the Board· of Control may not be empowered to adopt mere rules and regulations to facilitate the transaction of the business of the endowment rank. On the contrary, we' think the Supreme Lodge may well grant such authority and power, and that they may be lawfully exercised, such grant and exercise not being inconsistent with the terms of the charter. 1 Bacon (new ed.), sec. 80.

Our holding is that only the Supreme Lodge has power to pass a general law affecting the whole endowment rank, such as that against self-destruction, and under consideration in this case. The rulings of the trial Judge with respect to that law were correct for two reasons, first, because the Supreme Lodge had no power to authorize the Board of Control to enact that, or any other general law; and,

secondly, because the authority to pass such laws attempted and intended to be granted by section 9 of article eight of the constitution of 1888 was withdrawn by the adoption of the constitution of 1892, which embraced no such provision.

Affirm the judgment with costs.