LOUISA LANGE V. ROYAL HIGHLANDERS.*

FILED DECEMBER 6, 1905. No. 13,913.

1. **Beneficial Insurance Contract.** Where a member of a fraternal benefit association agrees to be bound by subsequently enacted by-laws, such contract will be upheld when the subsequently enacted by-laws are reasonable in their nature and legally enacted.

2. ———: NEW BY-LAW: FORFEITURE: SUICIDE. A subsequent by-law, legally enacted, providing for the forfeiture of a fraternal benefit certificate when the death of the member is occasioned by suicide, whether sane or insane, is a reasonable by-law and will be upheld.

3. ———: ———: CONSTRUCTION. A subsequent by-law providing for a forfeiture will be strictly construed against the association, and, if passed in contravention of the provisions of the statute governing such associations, it will be held void and of no effect.

---

* Rehearing allowed. See opinion, p. 196, *post.*

4. **Corporate Powers:** STATUTORY REGULATION. When the exercise of corporate power has been regulated by statute, the corporation cannot, by its by-laws or resolutions, change the mode of the exercise of this power.

5. **Fraternal Societies:** GOVERNMENT. A fraternal benefit association must have a representative form of government. This requires that the directors or other officers who have charge and control of the property and business of the society, and the management of its affairs, shall be chosen by the membership thereof. *State v. Bankers Union of the World,* 71 Neb. 622, followed and approved.

6. **Collateral Attack.** An attack on an illegal by-law of a fraternal benefit association is not a collateral attack on the right of the society to do business.

ERROR to the district court for Seward county: BEN-JAMIN F. GOOD, JUDGE.  *Reversed.*

*M. D. Carey* and *J. J. Thomas,* for plaintiff in error.

*R. S. Norval* and *Hainer & Smith, contra.*

OLDHAM, C.

This was an action by the plaintiff in the court below in her own right, and as guardian and next friend of her minor son, to recover the sum of $2,000 on a benefit certificate issued August 14, 1897, upon the life of Alexander D. Lange, by the Royal Highlanders, a fraternal benefit society organized under the laws of the state of Nebraska. The defense interposed was that Alexander D. Lange had come to his death from wounds inflicted by his own hand with suicidal intent. On issues thus joined there was a trial to the jury, and at the close of all the testimony the court directed a verdict for the defendant. Judgment was entered on this verdict, and to reverse this judgment plaintiff brings error to this court.

The facts underlying this controversy, which are either admitted or fully established by the proofs offered, are: That on August 14, 1897, the deceased, Alexander D.

Lange, was duly admitted to membership in the defend-
ant society and received a certificate of indemnity for the
amount sued for in the petition, payable at his death to
the beneficiaries therein named; that by the application
and certificate of indemnity it was agreed that the insured
should comply with the edicts of the association then in
force and such as thereafter should be enacted; that at
the time the deceased was admitted to membership there
was no edict or by-law of the society providing for a for-
feiture of the policy if the member came to his death by
suicide, whether sane or insane. It is clearly established
by the proofs offered that on June 26, 1902, Alexander
D. Lange died from the effects of a gun-shot wound
inflicted by his own hand with suicidal intent, and that
on June 12, 1901, the executive castle of the defendant
association assumed to pass and publish an edict or by-
law which provides as follows: "The benefit certificate
issued to a member shall become void and all benefits
thereunder shall be forfeited in case the member shall
die from suicide, feloniously or otherwise, sane or insane."

There are certain underlying propositions, sound in
principle and supported by the former decisions of this
and other courts of last resort, that govern the rights
and liabilities of members of voluntary associations,
whether mutual insurance companies or fraternal benefit
societies, that are applicable, in the first instance, to the
questions involved in this controversy. One of these
principles is that a member of such society, who agrees
in his application, or has the agreement incorporated in
his policy or benefit certificate, that he will comply with
the by-laws of the company then in force or thereafter
to be adopted, is bound by subsequent by-laws the same
as by those in force at the time his certificate was issued,
provided that such subsequent by-laws are reasonable in
their nature, and are properly adopted in conformity with
the rules of the order and the statute governing such
associations. *Farmers Mutual Ins. Co. v. Kinney*, 64
Neb. 808. Another underlying principle established by

the clear weight of authority is that, where a member of a fraternal benefit association contracts in his application or certificate of membership to be bound by subsequently enacted by-laws, a by-law, properly enacted, providing for the forfeiture of a certificate where the death of the member is occasioned by suicide, whether sane or insane, is a reasonable by-law and will be upheld. *Hughes v. Wisconsin Odd Fellows Mutual Life Ins. Co.*, 98 Wis. 292, and cases therein cited. Another well established principle is that a subsequent by-law providing for a forfeiture will be strictly construed most strongly against the association, and if passed in contravention of the provisions either of the articles of association, the constitution and by-laws of the society, or the statute governing it, it will be held *ultra vires* and of no effect. *Briggs v. Earl*, 139 Mass. 473; *Supreme Council, A. L. H., v. Perry*, 140 Mass. 580, 5 N. E. 635; *Supreme Lodge, K. P., v. Kutscher*, 179 Ill. 340, 70 Am. St. Rep. 115; *Supreme Lodge, K. P., v. La Malta*, 95 Tenn. 157; *Supreme Lodge, K. P., v. Stein*, 75 Miss. 107, 65 Am. St. Rep. 589. Again it is well established that, where the exercise of corporate power has been regulated by statute, the corporation cannot by its by-laws, resolutions or contracts, change the mode of the exercise of this power. 1 Thompson Corporations, secs. 849, 1,013; *Brewster v. Hartley*, 37 Cal. 15, 99 Am. Dec. 237.

From these principles it follows that the only question to be determined is as to whether the by-law relied upon as a defense has been legally enacted by a duly authorized body of the defendant association. This question requires an examination into the articles of incorporation and by-laws or edicts of the society, as well as the provisions of the statutes of the state regulating fraternal benefit associations. From the evidence contained in the record it appears that at some time prior to June, 1896, six persons conceived the idea of organizing the society known as the "Royal Highlanders"; that these six members constituted themselves the executive castle of the order, with

plenary powers in the organization. On August 10, 1896, the society commenced business with a membership of 311, and properly filed its articles of incorporation. It appears from the testimony that there never was a meeting of the members of the association, and that the officers were never voted on, either directly or indirectly, by the policy-holders of the order. On June 14, 1897, the executive castle, which had in the meantime increased its number to 12 members, together with one delegate of the association, held a meeting at which they formally elected themselves to the different offices in the executive castle for a term of four years, and adopted the edicts or by-laws in force at the time the certificate of membership was issued to Alexander D. Lange. Section 4 of the edicts so adopted provides as follows: "The executive castle shall be composed of its officers, its standing committees, its special committees, and its delegates elected by district conventions, as is hereinafter provided." In 1897 the legislature of Nebraska enacted: "A fraternal beneficiary association is hereby declared to be a corporation, society or voluntary association, formed or organized and carried on for the sole benefit of its members and their beneficiaries, and not for profit. Each such society shall have a lodge system, with ritualistic form of work and representative form of government." Laws 1897, ch. 47, sec. 1. And also enacted: "All such societies organized under the laws of this or any other state, territory or province, and now doing business in this state, may continue such business provided they hereafter comply with the provisions of this act." Laws 1897, ch. 47, sec. 8. On June 12, 1901, the executive castle of the order promulgated the by-law or edict in dispute at its regular meeting. The executive castle, among other powers, was authorized to institute representative castles as might be deemed essential, in accordance with its edicts. In furtherance of this power it had, prior to the meeting in 1901, provided for the election of representatives from districts composed of tributary castles having an aggre-

gate of not less than 500 members, nor more than 1,000. And at the meeting at which the by-law at issue was enacted, the executive castle was composed of 25 members, 9 of whom had been elected from representative castles, and 16 of whom were self-constituted officers and their appointees.

Now, as before stated, this executive castle had, by its own by-laws, granted itself plenary powers over the organization, and constituted itself the sole governing and law-making body of the order. Bearing in mind that the inherent right to enact by-laws for the government of a corporation is in the stockholders, and that this right can be exercised by a board of directors, or other similar body, only when such right is clearly conferred by the rules of the society and the statute of the state governing the incorporation, the question is, was the executive castle of the defendant, constituted as above set out, a representative body of the association? A representative form of government is defined in the Universal dictionary of the English language as one "conducted and constituted by the agency of delegates, or deputies, chosen by the people." This definition fairly expresses the modern American idea of a representative government, and, as applied to section 1, *supra,* is in full harmony with the construction placed upon that section by this court in the recent case of *State v. Bankers Union of the World,* 71 Neb. 622, wherein it was said:

"A fraternal benefit association must have a representative form of government. This requires that the directors or other officers, who have general charge and control of the property and business of the society and the management of its affairs, shall be chosen by the members."

While counsel for the defendant in error have filed a very able and persuasive brief urging us to reconsider and modify the definition of a representative form of government as expressed in the case just quoted, we find ourselves, after a careful consideration of their well written brief and strong oral argument, wholly unpersuaded

to do so. It seems to us that it was the manifest intention of our legislature in the enactment of sections 1 and 8, *supra,* to require all fraternal benefit associations, either then doing business or which should later be organized, to conduct the affairs of the associations for the sole benefit of the members and their beneficiaries, and that to further this object they required such associations to be governed by representatives elected by the members. The fact that defendant and other similar fraternal societies had been organized without even a fair semblance of a provision for a representative form of government in its modern sense most likely influenced the lawmakers in the passage of this statute. To prevent the possibility of a self-constituted oligarchy controlling and managing any such association for its own benefit, rather than for the good of the members and their beneficiaries, this wholesome measure was enacted. In our conception of the matter, these sections of the statute should be liberally construed for the purpose for which they were plainly enacted, for they seem to have been intended not to destroy but to save fraternal benefit societies.

It is earnestly contended by counsel for defendant in error that the attack on the suicide edict of 1901 is a collateral attack on the charter of the corporation, and it is urged that, even if the executive castle of the defendant society is illegally exercising its corporate functions, its right to do so can only be questioned in an action by the state in *quo warranto.* We concede the contention that the plaintiff cannot in her petition sue the defendant as a legal organization under the laws of the state, and then deny the validity of the organization. But does the denial of the authority of the executive castle, as constituted in 1901, to pass the edict in question amount to a denial of the legal authority of the society to do business? This depends on whether or not the edict assailed should be treated simply as a by-law of the association, or as part of the charter of the corporation. It is conceded in the brief of the association that, if the edict assailed is simply

a by-law and not part of the articles of incorporation, then an attack on the passage of such edict does not necessarily call into question the right of the society to do business. As was said in *Lincoln Shoe Mfg. Co. v. Sheldon,* 44 Neb. 279: "In this state the legislature does not by a special act charter a corporation, but all corporations are formed under general laws, and these laws and the articles of incorporation adopted in pursuance of and in conformity with such laws constitute the charter of a corporation in this state."

By reference to section 20, chapter 47, laws 1897, it will be seen that the requisite of authority for a fraternal benefit association to do business in this state is the filing with the auditor of a "certificate of association" signed by the persons who desire to associate themselves together for the purpose of forming such an organization, with a plan of business clearly and fully defined. It is these articles and the plan of association that the auditor is required to pass upon, and, if found correct, it is his duty to issue a certificate of organization. At the time the certificate of association was issued to the defendant society by the auditor, the statute requiring such societies to have a representative form of government had not been enacted, and, as the plan submitted was not then in contravention of the statute law, the auditor properly issued the certificate of organization. It is the certificate of association and the statute governing the corporation that stands in place of the charter of the association.

It is true that section 22, chapter 47, laws 1897, provides for the filing of the constitution and by-laws of fraternal societies with the auditor after the certificate is issued, but the auditor has nothing to do with the approval or rejection of the by-laws. It is only when it is brought to his attention that a society is doing business in contravention of the provisions of the statute that he is called upon to institute proceedings; and these proceedings are in the nature of an information in *quo warranto.* Moreover, the tenor and the very nature of the edict relied

upon classify it as a by-law providing for a forfeiture of a benefit certificate, and not as a constituent element of the charter authorizing the association to transact business in this state. We conclude that the edict in issue is merely a by-law of the society enacted by an unauthorized body, and, as against a member who received his certificate of membership prior to its adoption, is *ultra vires* and void, and subject to attack whenever and wherever found.

We therefore recommend that the judgment of the district court be reversed and the cause remanded for further proceedings according to law.

AMES and LETTON, CC., concur.

By the Court: For the reasons given in the foregoing opinion, it is ordered that the judgment of the district court be reversed and the cause remanded for further proceedings according to law.

REVERSED.

The following opinion on rehearing was filed February 8, 1907. *Judgment of reversal adhered to:*

1. Insurance: BENEFIT ASSOCIATION: GOVERNMENT: STATUTE. Where a fraternal-benefit association has not complied with the provisions of section 1, chapter 43 of the act of 1897, and adopted a representative form of government, its governing body is without power to adopt an edict or by-law changing the terms and obligations of a mutual benefit certificate theretofore issued to one of its members.

2. New By-Law: COLLATERAL ATTACK. An attack on such an edict or by-law on that ground does not amount to a collateral attack on the right of the society to transact business.

3. Suicide will not defeat a recovery upon a contract of life insurance or a mutual benefit certificate not procured by the insured with the intention of committing suicide, unless the contract so provides in express terms.

BARNES, J.

This case is before us on a rehearing. The facts, as disclosed by the record, are so clearly and concisely stated

in our former opinion, *ante*, p. 188, as to render any other or further statement unnecessary. . Two propositions decided by that opinion are vigorously assailed by counsel for the defendant: First, that the so-called edict or by-law of June 12, 1901, which is interposed as a defense to plaintiff's action, is void, and does not affect her right of recovery on the benefit certificate, which is the foundation of this suit; second, that suicide is not a defense to an action on such a certificate, unless made so by the contract itself, or some valid edict or by-law of the association.

1. The defendant's first contention requires but little consideration, because the reasoning and authorities contained in our former opinion fully answer the brief and argument of counsel on that point. If the statement describing the organization of the defendant, and the manner of the election or selection of its executive castle, is true—and, as its correctness has not been challenged we assume it to be so—it cannot be said that such executive castle gave to the defendant a representative form of government within the meaning of section 91, chapter 43, Compiled Statutes 1905 (Ann. St. 6483). At its session of 1897 the legislature of this state passed an act (Laws 1897, ch. 47), providing for the organization and government of "fraternal beneficiary associations," which contains the section above mentioned. Since that time all such associations have been required, where necessary, to so change the manner of electing or choosing the officers by which their business is conducted as to give them a representative form of government. *State v. Bankers Union of the World,* 71 Neb. 622. In that case it was said: "A fraternal beneficial association must have a representative form of government. This requires that the directors or other officers, who have general charge and control of the property and business of the society and the management of its affairs, shall be chosen by the members"—and the defendant therein was enjoined from transacting business until it should provide for and adopt

such a representative form of government. It appears that the defendant association was organized in the year 1896 by six persons, residents of Aurora, Nebraska, who prepared and filed its articles of incorporation, and thereupon constituted themselves its executive castle; that on August 10 of that year the society, having then acquired a membership of 311 persons, commenced business. It appears also that there never was a meeting of the members of the association, and said officers were never voted for, either directly or indirectly, by the policy-holders or members of the order. It further appears that in June, 1897, the first election was held, and that on June 14, 1897, the executive castle, which had in the meantime increased its own number to 12 members, including one delegate elected by the members of the association, held a meeting at which its members again elected themselves officers of the association for a term of four years, and adopted the edicts or by-laws in force at the time the certificate in question herein was issued to Alexander D. Lange. The affairs of the association are conducted by its executive castle, and section 4 of the edicts adopted by that body provides: "The executive castle shall be composed of its officers, its standing committees, its special committees and its delegates elected by district conventions, as hereinafter provided." After the passage of the act of 1897, above mentioned—the association presumably recognizing the fact that its form of government should be changed so as to comply with said law, and thus enable it to continue its business—the executive castle in December, 1897, at a special meeting, provided for a change in the manner of its own selection; and one June 12, 1901, when the by-law or edict in dispute was adopted and promulgated, said executive castle was composed of 25 members, 9 of whom had been elected from representative districts, and sixteen of whom were the self-constituted officers above mentioned, and their own appointees. That this was not a fair compliance with the provision of the law requiring the defendant to have a representative form of govern-

ment does not appear to us to be an open question. It follows, both upon principle and authority, that it had no power to adopt and promulgate any edict or by-law changing the nature and obligation of the contract with the assured member. It is conceded that the certificate itself contains no provision for forfeiture on account of suicide, and at the time it was issued the articles of incorporation, edicts and by-laws of the association were silent as to that matter. Therefore the question should be ruled by *Supreme Lodge, K. P., v. La Malta*, 95 Tenn. 157, 30 L. R. A. 838; *Supreme Lodge, K. P., v. Stein*, 75 Miss 107, 37 L. R. A. 775, and other cases, where it was held that an anti-suicide clause was not binding upon a member of the order, when such provision had been adopted by a board of control only, and not by the supreme lodge, although such lodge had attempted to delegate that power to the board.

It is contended, however, that this rule amounts to a collateral attack upon the organization of the defendant, and a declaration that all of its acts, contracts and proceedings are void. We do not so understand the matter. It must be conceded that the defendant, by filing its articles of incorporation in compliance with the law in force at the time of its organization, acquired the right to carry on the business for which it was created. It must also be conceded that when the legislature passed the act of 1897 it became the duty of the defendant to so change the manner of selecting or choosing its officers as to comply with the terms of that act. It attempted to do so, and, while the change made was not sufficient to confer power to alter the insurance contract without the consent of the insured, yet it was and is a *de facto* organization, and its acts and doings in the ordinary conduct of its business are to be construed by the rules applicable to such a condition. This, however, does not prevent a member or a beneficiary from questioning the validity of any of its edicts or by-laws by which it is sought to vary or change the obligations of a contract which it has made with

him, or for his benefit. We have not overlooked the fact that counsel intimated on the hearing that the defendant was unable to comply with the present law requiring it to adopt a representative form of government. We are unable to seriously consider this suggestion. It is self-evident that the power which enabled the association to twice change the number and the manner of choosing the officers comprising its executive castle is sufficient, if properly exercised, to enable it to make such further changes in regard to that matter as will create for the association a representative form of government. Indeed, nothing can stand in the way of such action but a determination on the part of the members of the executive castle to perpetuate themselves in office, and assume permanent control over the business of the association, and we will not presume that they are, or have been, actuated by such a motive.

For the foregoing reasons, our former opinion is right as to this point of the controversy, and should be adhered to.

2. We come now to consider the effect of the suicide of the assured member on the benefit certificate in question. It may be stated, at the outset, that to procure such a certificate with intent to commit suicide is a fraud on the association, and will defeat a recovery. In such a case the insurer would have the option of rescission, with all of its incidents, even as against the beneficiary. But in this case it is not claimed that the record discloses any such intention on the part of the deceased member. Indeed, the effect of his conduct is to exclude that idea. It appears that he took out his certificate on the 14th day of August, 1897; paid all of his assessments for a period of nearly five years, and was a member of the association in good standing at the date of his death. So it seems clear that the contract in this case was entered into in good faith, and without fraud. Notwithstanding this fact, the defendant contends that suicide is a defense to this action even if the benefit certificate and by-laws of

the association are silent on that subject. In support of this contention counsel cite *Ritter v. Mutual Life Ins. Co.,* 169 U. S. 139. In that case, however, the proof was plenary that the insurance was procured with the intent to commit suicide, but as the trial court had expressly charged the jury that in no case could there be a recovery if the assured had taken his own life designedly, while in sound mind, the question here at issue was necessarily involved in that decision. It was there held:

"Intentional self-destruction, the assured being of sound mind, is in itself a defense to an action upon a life policy, even if such policy does not, in express words, declare that it shall be void in the event of self-destruction."

We find, on an examination of that opinion, that the reasoning of the learned judge who wrote it was to some extent based on the assumption that the experience tables used as a basis for fixing the consideration to be paid for such insurance exclude suicide as a cause of mortality, but we find it to be a fact, as shown by the authorities, and one which we have never heard questioned, that all of the mortality or experience tables used as a basis for computing premiums on life insurance, and assessments for carrying benefit certificates in fraternal benefit associations, include all forms of death, of which suicide is considered one. *Campbell v. Supreme Conclave, I. O. H.,* 66 N. J. Law, 274, 54 L. R. A. 576. So, self-destruction, although it may shorten the period of the life expectancy of the member, and thus decrease the amount which he may be expected to pay to the association, does not violate the terms of his contract, unless it is so expressly stipulated therein, because that contingency is included in, and is a part of, the consideration which supports such contract. Suicide is only one of the many ways that may determine the event of death. Life insurance, of whatever kind and nature, is, in effect, an indemnity against the happening of that event, which is certain; and, insurance rates being based upon the average expectancy of life, as determined from experience tables, which include suicide as one of

the causes of mortality, that contingency is considered a part of the contract, unless it is otherwise stipulated therein.    As to the moral or ethical side of the discussion indulged in by Judge Harlan, we have to say that, while suicide was considered a crime at common law, yet we have no common law crimes in this state; neither have we any statute making suicide, or an attempt to commit suicide, a crime.    As to the matter of public policy, it may be said that suicide as a cause of death bears so small a percentage to the other causes of mortality, and is so infre- quently committed, that insurance companies and mutual benefit associations should be permitted, at their option, to provide in their policies and benefit certificates that voluntary suicide will avoid the contract, or leave them silent on that subject.    It is a custom, in this state at least, so well established as to become a matter of common knowledge that many life insurance companies and mutual benefit associations print their policies and certificates without the suicide clause, and, when selling insurance or soliciting membership, point to that fact as an evidence that their contracts are much more favorable and de- sirable than those which contain such a provision.    Again, the trend of modern authority upon this question has led at least one state to enact a law providing that suicide shall not be a defense to a life insurance policy or a mutual benefit certificate, unless it was contemplated at the time the insurance was obtained; and that act has been upheld by the court of last resort of that state.    *Kel- ler v. Travelers' Ins. Co.*, 58 Mo. App. 557.

Our attention is also directed to *Shipman v. Protected Home Circle*, 175 N. Y. 498, 67 N. E. 83.    In that case the benefit certificate was silent on the subject of suicide, while sane, but a by-law, subsequently enacted, provided that the certificate should be void if the insured should die by suicide, sane or insane.    No question was raised as to the power of the governing body of the association to adopt such a by-law, or its validity; and it was held to apply to a certificate in force at the time of the amend-

ment, because it was agreed therein that the member should comply with all the laws and regulations in force at the time he received the certificate, and all by-laws and regulations adopted thereafter. There is another case not called to our attention by counsel, to wit: *Hopkins v. Northwestern Life Ass'n*, 94 Fed. 729, where the United States circuit court, being bound by the case of *Ritter v. Mutual Life Ins. Co.*, 169 U. S. 139, logically extended the bar against recovery to a policy taken out by the insured for the benefit of his wife. The judgment, however, in that case was affirmed (99 Fed. 199) upon other grounds. These appear to be the only authorities which support the defendant's contention. We have been unable to find any others, and, if there are any, counsel have not called our attention to them. On the other hand, in the case of *Campbell v. Supreme Conclave, I. O. H., supra,* it was held that "suicide will not defeat recovery upon a contract of life insurance, not procured by the insured with the intention of committing suicide, unless the contract so provides in express terms."

In *Patterson v. Natural Premium Mutual Life Ins. Co.*, 100 Wis. 118, 42 L. R. A. 253, 69 Am. St. Rep. 899, it was held that intentional suicide, while sane, does not avoid a life insurance policy, in the absence of any provision therein to that effect, if third persons are beneficiaries, and, although suicide is technically a crime, it is not within the clause of an insurance policy providing that death in consequence of, or in violation of, law is not covered by the policy, where the usual suicide clause is omitted, and an absolutely incontestable clause included. An examination of the opinion, however, discloses the fact that the court declined to put its decision upon the incontestable clause and said:

"Bearing these things in mind, and while conceding the strength of the arguments upon public policy on which the Ritter case is based, we still think, in view of the prior decisions above cited to the contrary of the rule there laid down, and the general apparent acquiescence

in those decisions by the courts and by the people, that we ought to hold, in accordance with those decisions, that, in case where third persons are beneficiaries, intentional suicide of the insured while sane does not avoid the policy, in the absence of any provision in the policy to that effect. Whether the rule would apply to a case where the personal representatives of the insured were bringing the action for the benefit of the estate of the insured is not decided, because that case is not before us. In so holding, it becomes unnecessary to consider the effect of the incontestable clause upon this branch of the case."

Indeed, we find the rule in most jurisdictions to be that suicide is not a defense to an action on a life insurance policy, or mutual benefit certificate, unless it is made so by the terms of the contract. *Kerr v. Minnesota M. B. Ass'n,* 39 Minn. 174; *Horn v. Anglo-Australian and U. F. L. Ins. Co.,* 7 Jur. N. S. (Eng.) 673; *Pierce v. Travelers' Life Ins. Co.,* 34 Wis. 389; *Northwestern Benevolent and M. A. Ass'n v. Wanner,* 24 Ill. App. 357; *Mills v. Rebstock,* 29 Minn. 380; *Fitch v. American Popular Life Ins. Co.,* 59 N. Y. 557; *Keller v. Travelers' Ins. Co.,* 58 Mo. App. 557; *Knights Templar & M. L. I. Co. v. Berry,* 1 C. C. A. 561. Again, we find that this is not the first time this question has been before us. In *Supreme Lodge, S. & D. P., v. Underwood,* 3 Neb. (Unof.) 798, we held that: "a certificate of membership, in favor of a person therein named as beneficiary, in a fraternal insurance company organized for the benefit of its members and beneficiaries, is not avoided by the suicide of the assured, in the absence of a provision in the contract of insurance to that effect."

So we are of opinion that we should decline to follow *Ritter v. Mutual Life Ins. Co., supra;* that we ought to place ourselves in line with the great weight of authority in this country, which leads us to the conclusion that the defense of suicide in this case cannot be maintained.

For the foregoing reasons, our former judgment is adhered to.

JUDGMENT ACCORDINGLY.

SEDGWICK, C. J.

I concur in the conclusions reached upon both points discussed in the opinion, but do not concur in the language used in the criticism of the reasoning of the supreme court of the United States in *Ritter v. Mutual Life Ins. Co.,* 169 U. S. 139.