JOHN KENNETH DANBY,

*vs.*

THE OSTEOPATHIC HOSPITAL ASSOCIATION OF DELAWARE, a corporation of the State of Delaware.

*Supreme Court on Appeal, May 11, 1954.*

SOUTHERLAND, Chief Justice, and WOLCOTT and TUNNELL, Justices, sitting.

*John Merwin Bader* and *Robert C. Barab,* of Wilmington, for appellant.

*Thomas Herlihy, Jr.,* and *Morris Cohen,* of Wilmington, for appellee.

TUNNELL, Justice, for the court:

For several years plaintiff has dreamed of having a properly equipped osteopathic hospital in the Wilmington area. The corporate purpose of defendant is to found and maintain such a hospital. One of the several ways in which plaintiff has contributed toward the realiza-

tion of his dream has been to serve as president of defendant from 1949 until the occasion of his resignation as hereinafter noted.

In 1949 defendant purchased the Sellers estate at Edgemoor and in due course obtained from G. Morris Whiteside, II, a prominent architect, plans for the adaptation of the mansion on that property to hospital purposes.

Defendant lacked sufficient assets of its own to finance the hospital project, so, on the eve of commencing construction, plaintiff agreed to guarantee defendant's credit for bank loans up to a limit of $40,000, it then being thought that $40,000 in borrowed money would suffice. There was no written agreement or memorandum of any kind regarding plaintiff's guaranty, and the only written note of it was the following language in the minutes of a meeting of defendant's board of trustees which was held on September 18, 1952:

> "That the finance committee be authorized to have executed a note of the Corporation in the amount of $40,000.00 as guaranteed or endorsed by Mr. Danby with the Wilmington Trust Company. From the proceeds of this note the mortgage with the Wilmington Savings Fund Society be immediately discharged, the balance of the proceeds to be used to pay contractors' invoices for the renovation of the proposed new hospital."

Thereupon plaintiff endorsed three blank notes and gave them to defendant's treasurer. On September 25, 1952 defendant used one of these notes to obtain a loan in the sum of $11,000.

Some time before or during October, 1952, defendant executed one or more contracts for the construction of the hospital. The record shows that altogether defendant has executed three such contracts, but neither their dates, nor any suggestion as to their terms, nor the names of the signatories—except that the general contractor was William Conlyn—are in the record.

On October 27, 1952, defendant used the second of the three above-mentioned notes, this one being filled in for $10,000.

At some time after September 18, 1952, defendant's trustees concluded that a $40,000 guaranty would not be sufficient, so, because of

what was referred to merely as "additional construction costs", they prevailed upon plaintiff to endorse for a total of $55,000, rather than $40,000. We have no way of knowing whether these additional costs resulted from a misjudgment of the extent of commitments already made or from an expansion of the project beyond the scope originally undertaken. Again, there was no written agreement or memorandum of understanding between plaintiff and defendant, and the minutes of November 6, 1952, show only this:

> "The treasurer, Mr. Birch, reported that in accordance with the authorization made at the last meeting of the Board he had consulted with officials of the Wilmington Trust Company regarding an increase in the present loan of $40,000.00, and that the bank had agreed to loan the association an additional $15,000.00 upon the same terms as the original loan, making the total loan from the Wilmington Trust Company $55,000.00.

> "On motion made by Mr. Radcliffe, seconded by Mr. Fisher, the proper officials of the Association were authorized to execute the papers required to increase the present loan from the Wilmington Trust Company to $55,000.00."

Plaintiff proceeded to endorse three more blank notes and to deliver them to defendant.

On December 31, 1952, defendant used the third in the series of notes, obtaining thereon a loan of $10,000. This brought the total of borrowings guaranteed by plaintiff up to $31,000, where it still stands.

For a long period during the winter of 1953 plaintiff's health did not permit him to visit the construction site. Some time in the late winter or early spring of 1953 plaintiff says that he first learned that there had been serious departures from the Whiteside plans, other than some he had known about and been willing to accept. The record contains a great deal of technical material bearing upon deficiencies alleged by plaintiff to have resulted from these deviations, and, in particular, suggesting that because of these changes in plans, the hospital may not be entitled to a certificate from the Bureau of Hospitals of the American Osteopathic Association. Certification has importance in that young doctors can serve their internships and

residencies in certified institutions, while they cannot do so in uncertified ones. As to the actual prospect of certification, however, there is nothing certain in the record.

Plaintiff became so dissatisfied with the type of hospital being built that on May 22, 1953, he resigned his presidency of defendant corporation and demanded return of the four unused notes bearing his endorsement. Upon defendant's failure to surrender the notes, this action was instituted in the Court of Chancery seeking to enjoin defendant from using any more of them. After a hearing on the rule for a preliminary injunction, the Vice Chancellor denied the application, 34 *Del.Ch.* 172, 101 *A.2d* 308, and plaintiff has appealed to us on the ground that the refusal of this interlocutory relief amounted to an abuse of discretion.

In discussing the three grounds urged by plaintiff in support of his position, additional data from the record will be interspersed as required to develop the thought.

We shall first take up plaintiff's contention that one has only to notice the Statute of Frauds, 6 *Del.C.* § 2714, to detect the error of the court below. Since there was in fact no such memorandum as is required by the Statute of Frauds in cases to which the Statute applies, plaintiff's contention is sound if his promise to lend defendant the benefit of his personal credit is an undertaking "to charge any person to answer for the debt, default, or miscarriage, of another" within the meaning of that language in the statute.

The Vice Chancellor held that in this jurisdiction the law on the instant point has been settled by Judge Rodney's opinion in *Moscon v. North American Benefit Association,* 9 *W.W.Harr.* 495, 2 *A.*2d 898. That was a case in which the holder of a benefit insurance policy issued by one company brought suit against a different company, alleging that the defendant company had contracted with the company issuing the policy to take over all of the latter's assets and to assume all of its obligations. Since there was no memorandum of this alleged contract between the two companies, defendant demurred on the ground that the Statute of Frauds rendered the alleged contract

unenforceable, but it was held that the statute did not apply to promises made to the debtor.

In deciding the *Moscon* case Judge Rodney cited and relied upon the leading English case, *Eastwood v. Kenyon,* 113 *Eng. Reprint* 482 (485). There the plaintiff had borrowed money for the benefit of a minor child whose property plaintiff was managing as trustee. The minor child subsequently married a man who, for what was conceded to be legal consideration, promised the plaintiff that he would pay off the debt. The husband was sued to compel him to pay this outstanding debt, and his effort to avoid payment by invoking the Statute of Frauds was unsuccessful.

The plaintiff in our case takes the position that Judge Rodney's ruling was an unwarranted extension of the doctrine of *Eastwood v. Kenyon.* Although the plaintiff in the *Moscon* case was not the promisee, he was one of a class for whose benefit the promise was made, and we see no substance whatever in the attempted distinction. But in this appeal it would in any event be a purely academic exercise to distinguish the *Moscon* case from *Eastwood v. Kenyon,* even if it were possible to do so, for the case before us is not distinguishable from *Eastwood v. Kenyon.*

We approve Judge Rodney's language in the *Moscon* case as an accurate statement of the law on the point under discussion, and we conclude that it was not error for the Vice Chancellor to refuse to apply the Statute of Frauds.

Plaintiff next points to certain facts in the affidavits which he says establish that defendant has breached a clearly implied condition in the contract of guaranty, which breach entitles plaintiff on his part to revoke his promise in respect to all notes not yet used at the time of the revocation. The following excerpt from plaintiff's own affidavit furnishes such affirmative support as there is for this contention:

"In signing all of these notes, I relied upon the advice of Mr. Arthur W. Birch, Treasurer of the Association and an officer of defendant Wilmington Trust Company, with which bank I had dealt for many years. In signing the second group of

notes referred to in paragraph nine, I specifically relied on the adoption by the Board of the Whiteside plans as modified * * *, and on assurances which had been given to me by the Building Committee that those plans were being followed."

It is not alleged that plaintiff ever told anybody, in terms or in substance, that his undertaking was subject to a condition. Under the particular facts, therefore, the fatal weakness of this argument is that it rests upon a wholly subjective foundation.

The apparent uncertainty of plaintiff himself as to the precise nature of this condition, which he says was so clearly implied, emphasizes the subjective character of his "reliance". Paragraph "4" of the complaint categorically states that plaintiff agreed to sign the notes "in reliance on the assurance by the said Board of Trustees that Mr. Whiteside's plans would be followed". Yet we have already seen that he knew of some modifications of the Whiteside plans, which apparently were quite agreeable to him. Paragraph "5" of the complaint says this:

"Subsequently, without consulting plaintiff, the Board of Trustees of defendant made a number of substantial changes in the layout of the said hospital. These changes plaintiff is informed and believes will deprive the hospital of accreditation. * * *"

In another of the principal affidavits filed in behalf of plaintiff, Dr. Lipscomb listed certain allegedly ill-advised changes in the hospital design, prefacing the list with these words:

"The most important of the changes which had been made without Board approval were as follows: * * *."

Nothing in the briefs was effective to clarify plaintiff's position. It, therefore, remains uncertain whether this "condition" which plaintiff contends so clearly and unmistakably underlay his offer to lend his credit to the hospital was: (1) that the Whiteside plans would be followed, or (2) that the hospital would be a certified or accredited one, or (3) that no changes would be made without consulting plain-

tiff, or (4) that no changes in the plans would be made without board approval. Assuredly there can be no clearly implied condition of a transaction while the very nature of the condition remains unclear.

We conclude that it was not an error of any degree for the court below to determine on the basis of this record that there was no sufficient showing of a breach of condition.

The argument which is evidently plaintiff's favorite one, however, is that in respect to the three unused notes, there is nothing in the law to preclude him from revoking permission to use them. He contends that until they are used what is outstanding is no more than a bare continuing offer, unsupported by consideration, and, of and by itself, wholly lacking in juridical force. He cites 24 *Am.Jur., p.* 916; *Stearns, The Law of Suretyship, Sec.* 71 (*p.* 94) ; *Jordan v. Dobbins,* 122 *Mass.* 168, 170, 23 *Am.Rep.* 305; and other authorities affirming the undoubted general rule that unless an offer of guaranty—or for that matter, any other offer—is supported by consideration, or until it has been accepted or acted upon, it may be withdrawn.

The issue between the present parties includes differing interpretations of what transpired. This is the substance of plaintiff's interpretation :

"P. said, 'If you borrow $55,000.00, I am willing to endorse for you.' "

Plaintiff argues, therefore, that until the money is borrowed, there is no acceptance. But this is a very strained and artificial construction of the facts. We view them thus :

"P. said, 'If you build the hospital, I am willing to endorse to the extent of $55,000.00, so that the project can be financed.' The contracts were signed, and the building was under way when P. attempted to halt the deal."

This promise was made to a charitable corporation, and for that reason, we are not confined to the same orthodox concepts which once were applicable to every situation arising within a common law jurisdiction. There can be no denying that the strong desire on the part of the American courts to favor charitable institutions has

established a doctrine which once would have been looked upon as legal heresy. Doubtless this judicial attitude is largely responsible for the massive machinery of benevolence to be observed on every side. The reasons announced in justification of these holdings, however, have not always been technically satisfying. *Williston on Contracts, (Revised Ed.) Vol. I, p.* 404.

■ But regardless of its genesis, there can be no doubting the general American rule that while a bare promise to a charity is at first revocable, it does not remain so after the charity, in reliance upon that promise, has put itself into a legal position from which it cannot be expected to extricate itself without substantial injury. This principle is often spoken of as an application of the doctrine of promissory estoppel. See *Williston on Contracts, (Revised Ed.) Vol. I, pp.* 494-495; 50 *Am.Jur., pp.* 783-784; *Annotation* 115 *A.L.R.* 589.

■ As soon as the contracts were executed, the legal obligation to the contractors presumably bound defendant to complete the job. The "acceptance" was not the borrowing of the money, but the assumption of the obligation to build the hospital. And even if the building had been without a contract, a half-built hospital is of little use, so the application of sound business principles would have led to the same result.

This plaintiff, therefore, is within the prohibition of the promissory estoppel rule which applies to charities. By the same token, the Todd estate, in *American University v. Todd,* 9 *W.W.Harr.* 449, 1 *A.2d* 595, was not. There is no real difference between offering to give money to a hospital so that a building can be built and an offer to lend one's credit so that the necessary money can be borrowed and the building built. Both are such offers of assistance as are calculated to induce the hospital to build.

■ A logical corollary of this rule is that an undertaking to do something which is already obligatory will not furnish the basis of an estoppel. *Corbin on Contracts, Vol. I, p.* 647. At the oral argument before us, in rebuttal, plaintiff seized upon this corollary and applied it to the promise to increase his guaranty by the sum of $15,000.

The building project had already been undertaken when the promise was thus amended. What, then, did defendant do in reliance upon the promise of an increase? It must be admitted that it is not easy to give an effective answer to this argument of plaintiff's on the basis of the record before us. The affidavits are quite vague, if not altogether silent, on the points to which one would naturally turn to settle the question.

But this belated oral reference is the very first presentation of this whole theory of the case. Defendant is hardly to be penalized for not meeting arguments which had not yet been suggested by the plaintiff. It is clear that in the court below the $40,000 and the extra $15,000 were treated as being subject to the same rules of law. They were so treated by the Vice Chancellor and in the briefs before us, and, indeed, in all oral arguments prior to plaintiff's closing. Moreover, this matter has not yet come on for final hearing, and if there is factual support for plaintiff's new suggestion, presumably it can be properly established and relied upon at the trial. In the present circumstances, therefore, it is our duty to adhere to the well settled rule which precludes a party from attacking a judgment on a theory which was not advanced in the court below.

The judgment of the Court of Chancery will be affirmed.