WILMINGTON TRUST COMPANY, Personal
Representative of the Estate of John M.
Clark *v.* RUTH H. CLARK

[No. 46, September Term, 1980.]

*Decided January 16, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Carole S. Demilio,* with whom was *Frank T. Howard* on the brief, for appellant.

*David H. Parrack,* with whom was *Dennis S. Clower* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

This case of first impression calls for a determination whether the estate of a decedent who was obligated during his lifetime to make support payments to a former wife under a separation agreement is liable in tort or contract for monetary loss allegedly sustained by the wife as a result of her former husband's premature death by suicide.

John Clark and his wife, Ruth, entered into a separation agreement on March 2, 1976. At that time the parties were residents of Delaware and the agreement provided that it was to be interpreted and governed by the laws of that state. The agreement provided in pertinent part:

> "5. Husband shall pay to wife during her lifetime or until her remarriage . . . $24,450.00 annually [in equal monthly installments of $2,037.50] as alimony for her support and total maintenance. . . . No installments shall be paid under this paragraph after the death of Wife or Husband or after Wife's remarriage."

> \* \* \*

> "6. Husband agrees to make Wife beneficiary of his pension benefits from the E. I. duPont de Nemours & Company, Wilmington, Delaware, under the 'Joint and Survivor Option' provision of his pension. This provision provides that Wife will receive . . . $1,194.00 per month, totalling . . . $14,328.00 per year after Husband's death. . . . Husband may change the beneficiary under this provision if Wife should die prior to Husband's death."

> \* \* \*

> "18. This Agreement constitutes the entire understanding of the parties. No oral statements or prior written matter extrinsic to this Agreement shall have any force or effect."

The parties were subsequently granted an absolute divorce in Delaware and John moved to Cecil County,

Maryland. On August 13, 1977, at the age of 69, John committed suicide and the Wilmington Trust Company (Wilmington) was appointed as personal representative of his estate. Ruth filed a claim against the estate, based on the alleged loss of her right to alimony and support under paragraph 5 of the separation agreement. Wilmington denied the claim and Ruth sued the personal representative in the Circuit Court for Cecil County, alleging a cause of action for money damages in both tort and contract. The tort count of Ruth's declaration incorporated by reference the separation agreement and stated, in pertinent part:

> "Under [paragraph] 5 of the Agreement, Plaintiff was entitled to payments of $2,037.50 per month for the lifetime of decedent. Upon the death of decedent, pursuant to [paragraph] 6 of the Agreement, this payment is to be partially offset by payment to Plaintiff of approximately $1,338 per month under the 'Joint and Survivor' option of decedent's ... duPont ... pension." [1]

> * * *

> "Decedent's wrongful and tortious act of committing suicide deprived Plaintiff of the difference between $2,037.50 per month and $1,338 per month for the natural life expectancy of decedent, who was 69 years old at the time of his death."

The contract count of the declaration stated that:

> "2. Decedent's suicide was an intentional act by the Defendant's decedent, the result of which was a diminution of the value of Plaintiff's bargain. Part of the consideration for Plaintiff's acceptance of the terms of the Agreement was the expectation that decedent, who was in apparent good health, ... would live to a normal age for a person of his health and physical condition. Plaintiff assumed the risk of

---

1. The higher monthly payment of $1,338.00 was due to a subsequent increase in the amount of benefits payable by duPont under the Joint and Survivor option of the company's pension plan.

an accidental death but did not agree to a lessening of her expectations because of a voluntary act of decedent.

"3. Decedent's suicide was a breach of an implied promise to not voluntarily shorten his natural life span. It was a failure to deal with Plaintiff in good faith within the terms of the Agreement.

"4. Suicide was a contingency not specifically dealt with in the Agreement and an implied promise not to commit suicide was so basic as to be beyond the pale of consciousness of the parties. Such an implied promise was absolutely necessary to effectuate the intention of the parties."

Wilmington demurred to both counts of the declaration, claiming that neither stated a cause of action upon which relief could be granted. The court (Mackey, J.) sustained the demurrer as to the contract count without leave to amend, stating:

"With respect to the contractual aspects the agreement is clear and unambiguous. [Mr. Clark] was to pay alimony until his death. If they had wished to make special provision for suicide they could have done so. In fact they made three different provisions for payments to continue after the death of the husband. Moreover paragraph 14 of the agreement indicates the agreement contained all they intended to consider and that no other claims were to be entertained by either party against the other at any time." [2]

With regard to the tort count, the court stated that John's suicide was an intentional act and that suicide is unlawful in Maryland. While acknowledging that not every unlawful act constitutes an actionable tort, the court nevertheless ruled that:

---

2. Paragraph 14 of the agreement provided, in pertinent part, that "[e]xcepting only such rights and obligation[s] as are expressly provided in this Agreement," each of the parties waived and relinquished all claims against the other's property.

"Mr. Clark committed a civil wrong involving direct interference with the property rights of Mrs. Clark. In doing an unlawful act (suicide) he has at the same time breached a legal duty owed to Mrs. Clark. The breach of this duty was the proximate cause of damages suffered by Mrs. Clark. This was quite foreseeable."

The duty that John breached was not defined by the court, although it observed that "one has a duty to obey the law . . . ." The court overruled the demurrer to the tort count, stating:

"In terms of negligence, the Court concludes that Mr. Clark's suicide was a tort actionable at the instance of Mrs. Clark. In terms of an intentional act, which it is presumed to be, Mrs. Clark's case is even stronger."

At trial on the merits of the tort action, it was undisputed that John committed suicide. Testimony was presented by an actuarial expert that, taking into account John's and Ruth's normal life expectancies, John's premature death by suicide, and the difference between the payments received by Ruth while John was alive and the amount received under the pension plan, Ruth had been damaged in the amount of $75,311.25. A judgment for Ruth in that amount was entered by the court and Wilmington appealed. Ruth also appealed from the court's action sustaining the demurrer to the contract action. We granted certiorari upon petitions filed by each party, prior to decision by the Court of Special Appeals, to consider the novel issues presented in the case.

Wilmington contends that the lower court erred in awarding damages on the tort count because Ruth failed to establish that her former husband's suicide constituted a tort. The elements of an actionable tort, Wilmington argues, are a duty imposed by law on the defendant, which is owed to the plaintiff, a breach of that duty, and resulting damage. None of these elements, according to Wilmington, were established at the trial. Ruth argues that the lower court's

recognition of suicide as an intentional tort is supported by the common law. She contends that John's suicide was a wrongful act which adversely affected her right to receive alimony and support payments under the separation agreement. She suggests that the duty owed to her by John was the common law duty of a husband to support his wife, which was transformed into a contractual duty of support by the separation agreement. Finally, Ruth argues that the tort committed by John was intentional interference with contractual rights.

As to the contract action, Ruth contends that John impliedly promised that he would not violate the law, and when he committed suicide, he breached this promise and thereby injured her. The argument is based on the theory that the law of the place where a contract is made, including the criminal law, is incorporated into and made a part of every contract. Ruth advances the related argument that John made an implied promise to her not to commit suicide and that, consequently, his suicide constituted a breach of that promise and a failure to deal with her fairly and in good faith. Wilmington contends that no such implied promise was made. It maintains that the separation agreement was clear and unambiguous on the subject of the death of either party, and that Ruth assumed the risk of uncertainty as to the time and manner of John's death.

## I

In determining whether the lower court erred in sustaining Wilmington's demurrer to the contract action, we look to the substantive contract law of Delaware, since the parties agreed that the separation agreement would be interpreted and governed by the law of that state.[3] *See Kronovet v. Lipchin,* 288 Md. 30, 415 A.2d 1096 (1980).

---

**3.** Under the Uniform Judicial Notice of Foreign Law Act, Maryland Code (1974, 1980 Repl. Vol.), §§ 10-501 to 10-507 of the Courts and Judicial Proceedings Article, a party intending to rely on the law of another state must give reasonable notice to an adversary party "either in the pleadings or by other written notice." § 10-504. The parties, in relying upon Delaware law, complied with the Act in this case.

As already indicated, Ruth's contract claim is based on three separate theories. First, she places reliance on the rule, first enunciated in *Von Hoffman v. Quincy,* 4 Wall. (U.S.) 535, 18 L. Ed. 403, 408 (1867), that "the laws which subsist at the time and place of the making of a contract . . . enter into and form a part of it, as if they were expressly referred to or incorporated in its terms." This broad principle has been adopted in Maryland and by a number of other jurisdictions, *e.g., Swenson v. File,* 3 Cal. 3d 389, 475 P.2d 852, 90 Cal. Rptr. 580 (1970); *Dennis v. City of Rockville,* 286 Md. 184, 406 A.2d 284 (1979); *Feakes v. Bozyczko,* 373 Mass. 633, 369 N.E.2d 978 (1977); *In re Estate of Havemeyer,* 17 N.Y.2d 216, 217 N.E.2d 26, 270 N.Y.S.2d 197 (1966); *DePaul v. Kauffman,* 441 Pa. 386, 272 A.2d 500 (1971); *Gazale v. Gazale,* 219 Va. 775, 250 S.E.2d 365 (1979). We shall assume for the purpose of this decision, although there appears to be no Delaware case directly on point, that the Supreme Court of Delaware would accept this proposition as an accurate statement of Delaware law.[4] Ruth argues that the *Von Hoffman* rule should be read to encompass incorporation of the criminal law of the place where a contract is made. She further contends that when her former spouse committed suicide, he committed a criminal act in

---

4. With regard to two of the three contract theories advanced by Ruth, neither party has cited any Delaware case that either supports or undermines her theories. Rather than presume that Delaware law is the same as Maryland law in these areas, *see, e.g.,* Hall v. Hall, 238 Md. 191, 208 A.2d 593 (1965); Brown v. Fidelity & Dep. Co., 143 Md. 29, 121 A. 920 (1923), we shall proceed by determining what, in our opinion, the Supreme Court of Delaware would do if faced with the questions that are now before us. *Compare* Frericks v. General Motors Corp., 274 Md. 288, 336 A.2d 118 (1975) *with* Frericks v. General Motors Corp., 278 Md. 304, 363 A.2d 460 (1976). As stated above, we have found no Delaware case that expressly adopts the *Von Hoffman* rule. In Sabul v. Lipscomb, 310 A.2d 890 (Del. Super. 1973), however, the Superior Court of Delaware impliedly held that statutory rent escrow provisions were incorporated into a lease, and concluded that contrary provisions in the lease could not be given effect when to do so would frustrate the clear intention of the legislature. Although the Superior Court is a trial court, its decisions are reported and have been used as authority by the Supreme Court of Delaware. Because of this somewhat unique procedure, we decline to follow the general rule that only appellate decisions can be used as evidence of foreign law, Brown v. Fidelity & Dep. Co., *supra,* 143 Md. at 33, and hold that Sabul v. Lipscomb, *supra,* indicates that some form of the *Von Hoffman* rule would be accepted as the law of Delaware.

violation of the law that had become a part of their separation agreement, and in so doing breached that agreement.

The *Von Hoffman* rule has been criticized as overly broad, 3 *Corbin on Contracts* § 551 (1960); 4 *Williston on Contracts* § 615 (3d ed. 1961). To accept Ruth's argument is to conclude that whenever a party to a contract commits a criminal act, that act can be treated as a breach of contract. It is manifestly unlikely that any court would apply a rule of law that could lead to such an absurd result. As a general rule, therefore, it would appear preferable, at a minimum, to limit the application of the *Von Hoffman* rule to those situations in which the subject matter of the criminal statute or law sought to be incorporated is substantially related to the subject matter of the contract. *See generally, Wescott v. Allstate Ins.,* 397 A.2d 156 (Me. 1979); *Storbeck v. Oriska Sch. Dist. #13,* 277 N.W.2d 130 (N.D. 1979); *Quagliana v. Exquisite Home Builders, Inc.,* 538 P.2d 301 (Utah 1975). Thus, if the subject matter of a contract was suicide, then the alleged criminality of suicide would be relevant and, if suicide was found to be a criminal act, the contract would be unenforceable.[5] 14 *Williston on Contracts* § 1644 B (3d ed. 1972); *see generally, Shaw v. Aetna Life Ins. Co.,* 395 A.2d 384 (Del. Super. 1978); *Morford v. Bellanca Aircraft Corp.,* 45 Del. 129, 67 A.2d 542 (Del. Super. 1949). The subject matter of the separation agreement, however, was alimony, support, and the division of real and personal property. The alleged criminality of the act of suicide, therefore, has no bearing whatsoever on the question of whether John breached the separation agreement by committing suicide.

Ruth's second premise is that John impliedly promised that he would not prematurely end his life and thereby lessen the value of her monetary rights under the separation agreement. When interpreting contracts, the Delaware courts seek to give effect to the intention of the parties. *See Radio Corporation v. Philadelphia Storage Battery Co.,* 23 Del. Ch. 289, 6 A.2d 329 (1939); *Jefferson Chemical Co. v.*

---

5. For the purposes of this decision, we shall assume without deciding that suicide is a criminal or unlawful act in both Delaware and Maryland. *See* 5 Md. L. Rev. 324 (1941).

*Mobay Chemical Co.,* 267 A.2d 635 (Del. Ch. 1970); *St. Regis Sales Corp. v. Wilson Cabinet Co.,* 90 A.2d 488 (Del. Super. 1952). Under Delaware law, an implied promise is recognized if it is clear that the promise would have been made expressly by the parties if their attention had been drawn to it at the time of contracting. *Gould v. American Hawaiian Steamship Co.,* 331 F. Supp. 981 (D. Del. 1971); *Martin v. Star Publishing Co.,* 50 Del. 181, 126 A.2d 238 (1956); *Danby v. Osteopathic Hospital Ass'n,* 34 Del. Ch. 172, 101 A.2d 308 (1953), *aff'd,* 34 Del. Ch. 427, 104 A.2d 903 (1954); *Gluckman v. Holzman,* 30 Del. Ch. 60, 53 A.2d 246 (1947). When, however, the language used by the parties is clear and unambiguous, there is no need to look beyond this language to ascertain the parties' intent. *See Nepa v. Marta,* 415 A.2d 470 (Del. 1980); *Myers v. Myers,* 408 A.2d 279 (Del. 1979); *Jefferson Chemical Co. v. Mobay Chemical Co., supra,* 267 A.2d at 636-37 (Del. Ch. 1970); *Hajoca Corp. v. Security Trust Co.,* 25 A.2d 378 (Del. Super. 1942); *Laird v. Employers Liability Assur. Corp.,* 18 A.2d 861 (Del. Super. 1941). Therefore, if the express language of the Clarks' separation agreement encompasses death by suicide, Delaware will not recognize an implied promise not to commit suicide.

The fact that suicide is not specifically mentioned in the separation agreement is not dispositive. The agreement contains numerous provisions dealing with the effect that the "death" of either party will have on their respective rights and duties under the agreement, and the term "death" may have included death resulting from suicide. "Death" is not defined in the separation agreement. The common meaning ascribed to that word is the "cessation of life." *Black's Law Dictionary* 360 (5th ed. 1979); *see Thomas v. Anderson,* 96 Cal. App. 2d 371, 215 P.2d 478 (1950); *Eichner v. Dillon,* 73 App. Div. 2d 431, 426 N.Y.S.2d 517 (1980); *State Dept. of Hum. Serv. v. Northern,* 563 S.W.2d 197 (Tenn. App. 1978). It appears, therefore, that the clear and unambiguous meaning of the term "death" encompasses death by whatever cause.

Support for this conclusion can be found in cases involving the liability of life insurance companies for death caused by

suicide when the insurance policy contains no express provision regarding suicide. A majority of courts, including Maryland, have held that absent an express provision to the contrary, an insurer is liable under a life insurance policy or benefit certificate for death resulting from the insured's suicide. *See Parker v. Des Moines Life Ass'n,* 108 Iowa 117, 78 N.W. 826 (1899); *Gulfco Finance Co. v. Guillory's Estate,* 134 So. 2d 121 (La. App. 1961); *Supreme Conclave v. Miles,* 92 Md. 613, 48 A. 845 (1901); *Kerr v. Minnesota Mut. Ben. Ass'n,* 39 Minn. 174, 39 N.W. 312 (1888); *Lange v. Royal Highlanders,* 75 Neb. 188, 106 N.W. 224 (1905), *aff'd on rehearing,* 75 Neb. 196, 110 N.W. 1110 (1907); *Campbell v. Supreme Conclave,* 66 N.J.L. 274, 49 A. 550 (1901); *Darrow v. Family Fund Soc.,* 116 N.Y. 537, 22 N.E. 1093 (1889); *Marcus v. Heralds of Liberty,* 241 Pa. 429, 88 A. 678 (1913); *Jackson v. Loyal Additional Ben. Ass'n,* 140 Tenn. 495, 205 S.W. 318 (1918); *Patterson v. Natural Premium Mut. Life Ins. Co.,* 100 Wis. 118, 75 N.W. 980 (1898). In *Jarmon v. American Heritage Life Ins. Co.,* 267 A.2d 601 (Del. Super. 1970), the insured committed suicide after changing from a group to an individual life insurance policy. The individual policy excluded coverage of death by suicide for a period of two years, but the group policy made no mention of death by suicide. Although the Delaware court denied recovery to the beneficiary on the ground that the terms of the individual policy controlled, it made the following observations:

"If the provisions as to suicide in the group policy were the same as those in the ordinary life policy and if the policies were regarded as one for purposes of computing the time lapse under the suicide clause, then plaintiff would be entitled to recover for her husband's death.

"Such is not the case here. The group policy did not contain any suicide clause applicable to its basic life insurance coverage. . . . It is clear then that while the group policy was applicable, the insured's life was protected without time limitation against suicide." *Id.* at 602.

It appears, therefore, that Delaware courts would follow the majority rule.

The insurance cases contain an implicit ruling that death — the event that invokes the liability of the insurer — includes death by suicide. These cases, in conjunction with the commonly understood meaning of the word "death," indicate that that term covers death resulting from suicide. The consequences of John's suicide, therefore, are to be determined solely by reference to the clauses in the separation agreement that deal with his death. There was no implied promise not to commit suicide. Rather, there was an express agreement between the parties that defined their rights and duties under the agreement when the death of one party occurred, regardless of the cause of death. This express agreement precludes recognition of an implied promise not to commit suicide.

Ruth's third and final theory of recovery in contract is that John's suicide constituted a breach of an implied covenant of good faith and fair dealing that was an integral part of the separation agreement. While it appears that Delaware courts do recognize implied covenants of good faith and fair dealing, *see J. A. Jones Const. Co. v. City of Dover,* 372 A.2d 540 (Del. Super. 1977), even if we assume that an implied covenant existed in the present case, it does not necessarily follow that John's suicide was a breach of the covenant. Under the terms of the separation agreement, John, within 30 days of the execution of the agreement, was to establish a trust fund for his wife with a market value of $150,000, and pay to her an additional sum of $115,000. Until the death of either party or Ruth's remarriage, John was to make monthly alimony payments of $2,037.50. John was also required to make his wife the beneficiary under the " 'Joint and Survivor Option' " provision of his pension. In addition, Ruth was to be made the beneficiary under the " 'Survivor Benefit' " provision of his pension, which provided for estimated payments of $927 per month.[6] John was not permitted

---

6. The record does not reveal whether the " 'Joint and Survivor Option' " and the " 'Survivor Benefit' " provisions of John's pension were alternative or complementary provisions. Presumably, these were alternative provi-

under the agreement to remove his wife as beneficiary under either provision unless she predeceased him.

There is no allegation that John failed to perform any of his express duties under the separation agreement. We assume, therefore, that prior to his death John made the required payments and otherwise met his obligations in a faithful manner. Ruth nevertheless alleges that her former spouse's suicide was a breach of an implied covenant of good faith. She concedes that she assumed the risk of John's accidental death, but denies that she assumed the risk of death by suicide. We think the distinction is a difficult one to make. Had John died while engaged in an extremely dangerous activity, could it be successfully contended that he breached an implied covenant of good faith? Or, if John was gravely ill and died because he refused medical treatment, would this be deemed a breach of the covenant of good faith? The separation agreement contained specific provisions governing the death of either party. Because John was 68 years old at the time the agreement was entered into, these provisions were both prudent and necessary. Whether John's death was the result of natural causes, an accident, or suicide is immaterial. The separation agreement cannot be read to prescribe how John would live his life or choose to end it; the agreement simply made provisions for alternative sources of income for Ruth in the event of her former husband's death. There is no reason why the payments following death should have been any less than the payments to be made while John was alive. The respective amounts were negotiated by the parties and agreed to in writing. John's suicide was not an act of bad faith that constituted a breach of an implied convenant; it was an act that resulted in death — an event that had been anticipated by the parties and provided for in their agreement.

We think the lower court was correct in sustaining the demurrer without leave to amend because Ruth's decla-

---

sions, because if Ruth is receiving benefits under both provisions, then she would be receiving more money each month now than she would have if John were still alive.

ration failed to state a cause of action under any of her three theories of recovery in contract.

## II

The second major issue is whether John's suicide constituted an actionable tort. In overruling Wilmington's demurrer and awarding judgment in Ruth's favor, the lower court recognized a novel cause of action — suicide as an intentional tort.[7] We have found no case that addresses this precise issue.[8] In *Suhor v. Gooch,* 244 F. 361 (4th Cir. 1917), *cert. denied,* 247 U.S. 517, 38 S. Ct. 581, 62 L. Ed. 1245 (1918), a widow sued her deceased husband's estate after he had committed suicide. The parties had entered into an antenuptual agreement in which the wife, for substantial consideration, waived all rights she might have had in her future husband's estate. The husband's suicide was alleged to have "fraudulently cut off [the wife's] prospects of enjoying his estate and receiving gifts from him." In ruling that the wife had failed to state a cause of action, the court observed that "[t]here is no reason, and we think no authority, for saying that a man driven by despair to take his own life by the mere act of suicide commits a legal fraud on the property rights of his wife." *Id.* at 367. The court's decision ultimately was based on its holding that the wife's expectation of future gifts and support was not a property right and "therefore the blasting of that hope by suicide could not be a fraud." *Id.*

---

7. The trial court, in ruling on Wilmington's demurrer, indicated that Ruth could recover either for negligence or for an intentional tort. Which theory Ruth recovered under is unclear, but because Ruth has limited her arguments on appeal to various theories relating to intentional torts, and our ruling regarding duty is equally applicable to stating a cause of action in negligence, we shall limit our discussion to recovery for an intentional tort.

8. Suicide may give rise to a cause of action in tort in favor of those who are present when the act occurs or who discover the body after the fact. *See* In re Murray's Estate, 238 Iowa 112, 26 N.W.2d 58 (1947); Blakeley v. Shortal's Estate, 236 Iowa 787, 20 N.W.2d 28 (1945); Morgan v. Hightower's Adm'r, 291 Ky. 58, 163 S.W.2d 21 (1942); Mahnke v. Moore, 197 Md. 61, 77 A.2d 923 (1951); Shupe v. Martin, 321 Mo. 811, 12 S.W.2d 450 (1928). In general, the theory of recovery used is negligent or intentional infliction of emotional distress.

*Suhor v. Gooch, supra,* is distinguishable from the case before us in that Ruth alleges the injury she suffered as a result of her former husband's tortious conduct was a reduction in the amount of her monthly payments under the separation agreement. Ruth's alleged "right" to receive the higher, pre-pension payment is distinguishable from the "hope of future beneficience," *id.,* before the court in *Suhor.* We look to general tort principles, therefore, in deciding whether the trial court's judgment was correct.

Although it is true, as Ruth asserts, that there is no need for a tort to have a name before an action for damages can be maintained, it is equally clear that legal remedies do not exist for every injury suffered by a member of society. *E.g., Edison Realty Co. v. Bauernschub,* 191 Md. 451, 62 A.2d 354 (1948); *State v. Machen,* 164 Md. 579, 165 A. 695 (1933). While we have recognized new causes of action in tort, *e.g., Harris v. Jones,* 281 Md. 560, 380 A.2d 611 (1977), it is essential if suicide is to be recognized as an intentional tort that it fit within certain general principles that govern the law of torts. One of these principles is the existence of a legal duty owed by the defendant to the plaintiff. In the absence of such a duty, there can be no recovery in tort. *See Krieger v. J. E. Greiner Co.,* 282 Md. 50, 382 A.2d 1069 (1978); *Scott v. Watson,* 278 Md. 160, 359 A.2d 548 (1976); *Acker, Merrall & C. Co. v. McGaw,* 106 Md. 536, 68 A. 17 (1907).

The trial court appears to have held that John had a legal duty not to kill himself and that this duty was owed to Ruth. Ruth suggests that the duty owed to her by John was the common law duty of spousal support, which was transformed into a contractual duty by the separation agreement.

Assuming without deciding that the lower court correctly ruled that John's suicide was an unlawful act, it is nevertheless clear that not every violation of the criminal law constitutes a tort, nor does the criminal law automatically impose a tort duty upon one person that is owed to another. Indeed, although criminal cases may be helpful in determining what type of conduct the law will condemn, the "criminal law must be regarded as a very unreliable analogy to the law of torts." W. Prosser,

*Handbook of the Law of Torts* § 1, at 9 (4th ed. 1971). One of the limits to imposition of tort duty by analogy to a criminal law is that the injured party must be within the class of persons that the particular criminal law is designed to protect. *See Jacobson v. New York, N. H. & H. R. Co.,* 206 F.2d 153 (1st Cir. 1953), *aff'd,* 347 U.S. 909, 74 S. Ct. 474, 98 L. Ed. 1067 (1954). Thus, unless Ruth was a member of a class sought to be protected by recognition of suicide as a criminal offense, no tort duty can be imposed upon John solely because of the criminal nature of his act.

Under the English common law, suicide was a felony punishable by ignominious burial on the highway and forfeiture of the suicide's goods and chattels to the king. R. Perkins, *Criminal Law* 82 (2d ed. 1969). Suicide is no longer a crime either in England or the majority of American jurisdictions, and no American jurisdiction punishes a suicide through forfeiture of goods or any other means. *See* Comment, *The Punishment of Suicide — A Need for Change,* 14 Vill. L. Rev. 463 (1969); 7 N.C. Central L.J. 156 (1975). Whatever justifications are advanced for deeming suicide an unlawful act, it seems unlikely that protection of a former wife who was not physically present when the act occurred would be included. The State may have an interest in preserving the lives of its citizens, but it does not confer automatically a tort cause of action upon those persons who believe they have been injured by the illegal act. We hold that Ruth cannot premise a tort cause of action on the mere fact that suicide is an unlawful act, and the trial court was in error in concluding that John owed Ruth a duty not to commit an unlawful act — suicide.

There is no merit to Ruth's argument that the duty owed to her by her former spouse was a common law duty of support, transformed into a contractual duty of support by the separation agreement. While a tort action in favor of a contracting party can be founded upon a duty arising out of the contractual relationship, *see Wedeman v. City Chevrolet Co.,* 278 Md. 524, 366 A.2d 7 (1976), the duty giving rise to the tort cause of action must be independent of the contractual obligation. *Heckrotte v. Riddle,* 224 Md. 591,

168 A.2d 879 (1961); *see Matyas v. Suburban Trust Co.,* 257 Md. 339, 263 A.2d 16 (1970). By suggesting that the common law duty of support was transformed into a contractual duty, Ruth has, in effect, conceded that her alleged tort cause of action is actually an action for breach of contract. Mere failure to perform a contractual duty, without more, is not an actionable tort. *Heckrotte, supra.* Thus, neither Ruth nor the trial court identified a viable tort duty owed by John to Ruth.

Ruth finally suggests that if the "tort" committed by John fits within any recognized category of tort liability, it is intentional interference with contractual rights. We have recognized that a third party who, without legal justification, intentionally interferes with the rights of a party to a contract, or induces a breach thereof, is liable in tort to the injured contracting party. *Baird v. C. & P. Tel. Co. of Baltimore,* 208 Md. 245, 117 A.2d 873 (1955); *Goldman v. Building Assn.,* 150 Md. 677, 133 A. 843 (1926); *Cumberland Glass Mnf'g Co. v. DeWitt,* 120 Md. 381, 87 A. 927 (1913), *aff'd,* 237 U.S. 447, 35 S. Ct. 636, 59 L. Ed. 1042 (1915); *Knickerbocker Co. v. Gardiner Co.,* 107 Md. 556, 69 A. 405 (1908). However, we have never permitted recovery for the tort of intentional interference with a contract when both the defendant and the plaintiff were parties to the contract. Indeed, it is accepted that there is no cause of action for interference with a contract when suit is brought against a party to the contract. *Battista v. Lebanon Trotting Ass'n,* 538 F.2d 111 (6th Cir. 1976); *Robbins v. Ogden Corp.,* 490 F. Supp. 801 (S.D.N.Y. 1980); *Business Equipment Center, Ltd. v. DeJur-Amsco,* 465 F. Supp. 775 (D.C.D.C. 1978); *Stauffer v. Fredericksburg Ramada, Inc.,* 411 F. Supp. 1136 (E.D. Va. 1976); *Wild v. Rarig,* 302 Minn. 419, 234 N.W.2d 775 (1975), *cert. denied,* 424 U.S. 902, 96 S. Ct. 1093, 47 L. Ed. 2d 307 (1976); *Ross v. Life Ins. Co. of Virginia,* 273 S.C. 764, 259 S.E.2d 814 (1979); *Houser v. City of Redmond,* 91 Wash.2d 36, 586 P.2d 482 (1978); *Board of Trustees v. Holso,* 584 P.2d 1009 (Wyo. 1978); Prosser, *supra,* § 192. The rationale for this rule is that a suit for breach of contract is the appropriate remedy when one party to a contract alleges that another contracting party has interfered with his

contractual rights. John was a party to the separation agreement, and therefore no tort liability resulting from his suicide can be recognized under the theory of interference with contract.

We thus conclude that Wilmington's demurrer to the tort count of the declaration should have been granted and that the monetary judgment for Ruth must be reversed.

*Judgment reversed.*
*Costs to be paid by Ruth Clark.*