**OHIO, PENNSYLVANIA AND WEST VIRGINIA COAL COMPANY; Wyoming Pocahontas Land Company; Quaker Coal Company; Quaker Holding Company; and Donn A. Chickering, Plaintiffs–Appellees,**

v.

**PANENERGY CORPORATION, Defendant–Appellant.**

No. 96–3559.

United States Court of Appeals, Sixth Circuit.

Argued April 24, 1997.

Decided July 29, 1997.

Thomas B. Ridgley, Vorys, Sater, Seymour & Pease, Columbus, OH, Arthur Newbold (argued and briefed), Dechert, Price & Rhoads, Philadelphia, PA, for Plaintiffs–Appellees.

Robert A. Pitcairn, Jr. (argued and briefed), Katz, Teller, Brant & Hild, Cincinnati, OH, for Defendant–Appellant.

Before: JONES, SUHRHEINRICH, and SILER, Circuit Judges.

## OPINION

SILER, Circuit Judge.

Defendant PanEnergy Corp. (formerly known as Panhandle Eastern Corp. and hereinafter referred to as "Panhandle") appeals from the district court's order granting summary judgment in favor of plaintiffs Ohio, Pennsylvania & West Virginia Coal Company (formerly known as C&N Corp. and hereinafter referred to as "OP&WV"); Wyoming Pocahontas Land Co. (formerly known as Youghiogheny & Ohio Coal Co. and hereinafter referred to as "Y&O"); Quaker Coal Company; Quaker Holding Company; and Donn A. Chickering (collectively, "plaintiffs" or "the Quaker Group")[1] and denying its motion for summary judgment in this diversity breach of contract action. Panhandle argues that the district court erred in its construction of the indemnification provisions contained in the Stock Purchase Agreement. For the reasons that follow, we reverse and remand.

## BACKGROUND

Y&O, an Ohio corporation, was acquired by Panhandle in 1976 and ceased active mining operations in 1987. In 1989, Panhandle and Quaker Coal began negotiations for the sale of Y&O to Quaker Coal. At the time of these negotiations, Y&O owned coal reserves, coal mines, and coal processing facilities and

---

1. Donn A. Chickering owns all of the stock of Quaker Holding, which owns all of the stock of Quaker Coal. Quaker Coal owns all of the stock of OP&WV, which owns all of the stock of Y&O.

equipment. It was also the settlor of the Y&O Employee Black Lung Disease Benefit Trust (the "Y&O Trust"), an irrevocable trust established to satisfy Y&O's black lung liabilities under federal and state laws. According to actuarial projections in 1989, the Y&O Trust was then overfunded in the amount of approximately $18,000,000. Under the law that existed at that time, the overfunding could only be used to pay Y&O's black lung liabilities. I.R.C. § 501(c)(21)(A)(i) (1986) (amended 1992). Any funds that remained after all liabilities had been paid were to be paid to the United States government. I.R.C. § 501(c)(21)(B)(iii) (1986).

The negotiations for the sale of Y&O resulted in the Stock Purchase Agreement ("the Agreement") dated August 21, 1989. Under the Agreement, closing was contingent upon Quaker Coal's obtaining a ruling by the Internal Revenue Service ("IRS") that the Y&O Trust could be used to pay the black lung liabilities of any of the companies comprising the Quaker Group. While the parties awaited the ruling, they became aware of proposed legislation in the United States Congress, Senate Bill 1708 ("Senate Bill"), which sought to impose liability on certain coal companies, such as Y&O, for health benefits for retired miners and their families. These prospective liabilities for health benefits had nothing to do with black lung liabilities.

As a result of the Senate Bill, the parties negotiated an amendment (the "First Amendment") to the Agreement. The indemnification provisions of the First Amendment read as follows:

> 3. *[PANHANDLE'S] INDEMNITY FOR CERTAIN LEGISLATION.*
> Subject to the conditions and limitations set forth in Section 4 below, [Panhandle] hereby agrees to indemnify and hold harmless Buyer, Y&O, each trade or business under common control, within the meaning of section 414(c) of the Internal Revenue Code of 1986, with Y&O after the Closing under the Agreement

("Affiliate"), and the shareholders, directors, officers, and employees of Buyer, Y&O and each such Affiliate (each an "Indemnitee" and collectively, the "Indemnitees"), against and hold harmless Indemnitees against any liability for Y&O having to make payments into the UMWA health benefit trust funds as the result of passage of legislation by the United States Congress similar in content to that proposed in [Senate Bill] 1708.[2]

> 4. *[PANHANDLE'S] INDEMNITY LIMITATION AND CONDITIONS.*
>
> The parties agree that in addition to limitations and conditions included in the Agreement, the indemnity provided by [Panhandle] to the Indemnitees is further limited and conditioned as follows:
>
> 4.1 *Maximum Dollar Exposure.* Amounts payable in respect of indemnification obligations of [Panhandle] shall not exceed the purchase proceeds received by [Panhandle] at the Closing.
>
> 4.2 *Conditions.* [Panhandle's] indemnity as set forth in Section 3 above shall be subject to the following conditions:
>
> (a) This indemnification only applies if the legislation would have been applicable to Y&O as if Y&O had continued in its existing status of no mining, no operations and no production, processing or sale of coal at any of its properties and had remained a subsidiary of [Panhandle] and if Indemnitee is adversely affected. Subject to Section 4.1 above, the amount payable by [Panhandle] in respect of its indemnification obligations under Section 3 above shall not exceed the liability that Y&O would have incurred if Y&O had continued in its existing status of no mining, no operations and no production, processing and sale of coal at any of its properties and had remained a subsidiary of [Panhandle].

---

2. The parties do not dispute that Quaker Coal, Quaker Holding, OP&WV and Y&O are "affiliates" within the meaning of section 3, nor that the above plaintiffs and Chickering are "indemnitees" under this section.

(b) The legislation triggering any Y&O liability must be enacted and be effective prior to March 1, 1994.

On January 16, 1990, the IRS issued a ruling that the Y&O Trust could be used to pay the black lung liabilities of all companies affiliated with Quaker Coal, including any companies that it might later purchase. On February 28, 1990, the parties executed the First Amendment and closed on the Agreement.

On October 24, 1992, Congress enacted the Rockefeller Act, 26 U.S.C. §§ 9701–22, which contained provisions similar to those of the 1989 Senate Bill. Like the Senate Bill, the Rockefeller Act imposed liability on Y&O for health benefits for certain retired miners and their families. Unlike the Senate Bill, however, the Act contained a provision permitting Rockefeller Act liabilities to be paid out of overfunded black lung trusts. This provision was not anticipated by the parties at the time of the First Amendment's execution. Because Y&O had an overfunded black lung trust, the Rockefeller Act permitted Y&O to satisfy its liabilities under the Act by making payments from the Y&O Trust. As of January 16, 1996, Y&O had made payments totaling $2,066,128 from the Y&O Trust. Plaintiffs asked Panhandle to reimburse them for those payments, but Panhandle refused. The most recent actuarial study calculated the present value of Y&O's future Rockefeller Act liabilities as approximately $9,700,000.

In 1995, plaintiffs sought a declaratory judgment from the district court that Panhandle was obligated to pay them up to $18,900,000 under the terms of the indemnification provisions contained in the Stock Purchase Agreement. Under a breach of contract theory, the plaintiffs also sought damages in the amount of $1,346,067.29, together with interest, costs, legal fees and expenses, for Panhandle's failure to reimburse them for payments. Both sides moved for summary judgment. The district court denied Panhandle's motion and granted plaintiffs' motion. Judgment was entered in favor of plaintiffs in the amount of $2,066,128, with interest at the legal rate under Delaware law [3] from the date each payment

was made, plus attorney's fees to be determined at a later time. The district court also entered a declaratory judgment that pursuant to the Stock Purchase Agreement, Panhandle was obligated to indemnify plaintiffs for Y&O's liabilities under the Rockefeller Act, 26 U.S.C. § 9701–22.

## DISCUSSION

### I. Standard of Review

■ As the facts in this case are not in dispute, we review the district court's grant of plaintiffs' motion for summary judgment and denial of Panhandle's motion for summary judgment de novo. *Northeast Ohio Coalition For The Homeless v. City of Cleveland,* 105 F.3d 1107, 1109 (6th Cir.1997).

### II. Delaware Rules of Contract Interpretation

■ Under Delaware law, contract interpretation is a question of law. *Pellaton v. Bank of New York,* 592 A.2d 473, 478 (Del. 1991). The court must first attempt to ascertain the intent of the parties from the language contained in the contract. *Citadel Holding Corp. v. Roven,* 603 A.2d 818, 822 (Del.1992). "If a writing is plain and clear on its face, i.e., its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *City Investing Co. Liquidating Trust v. Continental Cas. Co.,* 624 A.2d 1191, 1198 (Del.1993). However, a court is not free to disregard extrinsic evidence of the parties' intent "if the words of the agreement can only be known through an appreciation of the context and circumstances in which they were used. In that situation the language used by the parties is subject to different meanings and is, thus, ambiguous." *Id.* (quotation marks and citation omitted). Contractual language is not rendered ambiguous simply because parties disagree over its meaning. *Id.*

### III. Construction of the Indemnification Provisions

■ Under section 3 of the First Amendment of the Agreement, Panhandle agreed to

---

**3.** Delaware law applies pursuant to a choice of    law provision in the Stock Purchase Agreement.

"hold harmless Indemnitees against any liability for Y&O having to make payments into the UMWA health benefit trust funds" as required by the Rockefeller Act. Although the district court concluded as a matter of law that the language of this section was clear and unambiguous, it evidently believed that the meaning of the words could only be known by looking at the circumstances surrounding the execution of the First Amendment when it stated:

> At the time the Amendment was signed, the parties were fully aware of the fact that Y&O had the power to direct the use of trust monies to make payments to the health benefit funds, yet there is no language in the Amendment which could reasonably be interpreted as stating that there is no duty to indemnify where trust assets are used.[4]

This conclusion, however, does not accurately reflect the legal framework that existed at the time of the First Amendment's execution.

For purposes of this decision, we will assume that if the Supreme Court of Delaware were presented with the issues that are now before us, then it would accept the following proposition as an accurate statement of Delaware law: a contract impliedly adopts the laws that subsist at the time of the making of the contract. *See Wilmington Trust Co. v. Clark*, 289 Md. 313, 424 A.2d 744, 749–50 & n. 4 (1981) (assuming this principle, which was first announced in *Von Hoffman v. City of Quincy*, 4 Wall. 535, 550, 18 L.Ed. 403, 408 (1867), would be adopted in Delaware). Although applying Florida law, the Seventh Circuit, in *Florida East Coast Ry. v. CSX Transp., Inc.*, 42 F.3d 1125, 1129–30 (7th Cir.1994), offers a useful explanation concerning this rule of contract interpretation:

> [T]he legal framework that existed at the time of a contract's execution must bear on its construction. Contracts are presumed to be written in contemplation of the existing applicable law. Specifically, parties are assumed to have contracted with reference to those statutory provisions that relate to the subject matter of their contract. And a subsequent change in the law cannot retrospectively alter the parties' agreement. Whereas the law in effect at the time of execution sheds light on the parties' intent, subsequent changes in the law that are not anticipated in the contract generally have no bearing on the terms of their agreement.

(Citations omitted).

Here, at the time of the First Amendment's execution, the parties were aware, pursuant to the IRS ruling, that Quaker Coal was permitted to use the Y&O Trust to pay the black lung liabilities of any company within the Quaker Group. They were not aware, as the district court incorrectly stated, that the Y&O Trust could be used to make payments to the health benefit funds. Indeed, these funds were not even in existence on February 28, 1990, the date of the First Amendment's execution. They were a creation of the Rockefeller Act, which was enacted on October 24, 1992.

When the First Amendment was executed, the parties were merely aware that if the Senate Bill were passed, Y&O would be subject to liabilities for health benefits for retired miners and their families. The parties did not anticipate that what became Rockefeller Act liabilities could be paid out of overfunded black lung trusts, such as the Y&O Trust. At that time, it would have been impermissible for employers to pay such liabilities from black lung trusts. *See* 26 U.S.C. § 501(c)(21) (prohibiting use of assets of black lung trusts for purposes other than satisfaction of black lung liabilities; payment of premiums for insurance covering such liabilities; payment of administrative and other incidental expenses of the trust; investment; and payment in the Black Lung Disability Trust Fund).

The district court erred when it construed the language of the First Amendment as imposing a duty to indemnify when assets from the Y&O Trust were used to make payments to the health benefit funds. In making this construction, the court reasoned that "[t]here is no language in the Amendment which explicitly or implicitly requires

---

**4.** As noted above, under Delaware law, such analysis is to be applied when the court is faced with ambiguity. *See City Investing*, 624 A.2d at 1198.

as a prerequisite for indemnification that Y&O make payments using funds other than Y&O Trust funds." However, at the time of the First Amendment's execution, the parties had no reason to mention the Y&O Trust because they did not believe that such payments could be made from the trust. The law that existed at that time did not permit trust assets to be used for that purpose. In addition, the Senate Bill did not even mention the possibility of being able to satisfy the prospective liabilities from overfunded black fund trusts. The district court should have looked only at the law in effect at the time of the execution in its attempt to gain an understanding of the parties' intent. *See Florida Coast Railway*, 42 F.3d at 1130.

A proper construction of the First Amendment is that it was the intent of the parties that if Y&O or any other member of the Quaker Group was "adversely affected" by Y&O's having to make payments for health benefits for retired miners that ultimately were enacted in the Rockefeller Act, Panhandle's duty to indemnify would be triggered. In interpreting the phrase "adversely affected," the district court stated that an indemnitee "must be adversely affected financially in some way due to the actual payment of contributions by the indemnitee to the health benefit funds to satisfy Y&O's liability."

As of this moment, no indemnitee has made any payments to the health benefit funds. Y&O, while liable for the Rockefeller Act payments, has not had to and has not made any payments. Nor has any other member within the Quaker Group made any Rockefeller Act payments. Payments have come only from the Y&O Trust, which is not an indemnitee nor is, contrary to the district court's finding, in effect, an asset of Y&O. The Y&O Trust required that Y&O divest itself of all claims to trust assets and no other member of the Quaker Group has any rights in the trust.

According to the district court, however, an indemnitee has been adversely affected because the use of trust assets to satisfy Y&O's Rockefeller Act obligations diminishes its ability to pay future obligations.[5] Thus, the court reasoned, each member within the

Quaker Group, which has a complete ownership interest in Y&O, is adversely affected by the depletion of the trust funds. The court ignored the fact that the Y&O Trust will continue to be vastly overfunded after making all payments that are presently foreseeable. In sum, because the Y&O Trust is not an indemnitee and because the record contains no evidence that an indemnitee has been "adversely affected financially," Panhandle's duty to indemnify has not been triggered.

## CONCLUSION

The district court erroneously construed the First Amendment to the parties' Stock Purchase Agreement as imposing a duty upon Panhandle to indemnify when funds from the Y&O Trust are used to satisfy Y&O's Rockefeller Act liabilities. Accordingly, the decision is **REVERSED** and **REMANDED** with instructions to enter judgment in favor of Panhandle.

---

**5.** The district court did not define what those    "future obligations" were.