# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| MATTHEW B. MOONEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.: N17C-01-374 AML |
| | ) | |
| E. I. DU PONT DE NEMOURS AND COMPANY, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: August 22, 2017
Decided: November 28, 2017

## MEMORANDUM OPINION

### Upon Defendants' Motion to Dismiss, Granted

Matthew B. Mooney, Esq., *Pro Se*.

Kathleen F. McDonough, Esq., John A. Sensing, Esq., and Jesse L. Noa, Esq. of POTTER ANDERSON & CORROON, LLP, Wilmington, Delaware; *Attorneys for E. I. du Pont de Nemours and Company*.

**LeGROW, J.**

In 2015, E. I. DuPont de Nemours and Company ("DuPont") spunoff its performance chemicals division into the Chemours Company ("Chemours"). The spinoff was part of DuPont's ongoing effort to reenvision the company for the market and shareholders. In the months leading up to the spinoff, DuPont's officers made numerous optimistic statements regarding the purpose of the spinoff, its expected effect on DuPont, and Chemours' anticipated financial prospects as a stand-alone entity. The plaintiff in this action purportedly purchased DuPont's stock in reliance on those statements. After selling his stock at a loss, the plaintiff alleges DuPont fraudulently misrepresented the spinoff's potential success in order to induce investor participation in an unsound, intentionally-misleading business strategy.

The key question in this case is whether the statements on which the plaintiff purportedly relied were statements of fact or forward-looking statements. The statements at issue, all couched in terms of the speaker's expectation or opinion about future events, were forward-looking statements that only can form the basis of a fraud claim when the plaintiff adequately alleges the statements were known to be false when made or were made in bad faith. Here, the only allegations the plaintiff identifies to support that standard are later-occurring events. The lack of any contemporaneous factual allegations suggesting DuPont's officers made false statements knowingly or with lack of good faith dooms the plaintiff's claims.

**FACTUAL BACKGROUND**

Except as otherwise noted, the following facts are drawn from the complaint and the documents it incorporates by reference, drawing all reasonable inferences in plaintiff's favor. DuPont is a Delaware corporation engaged in the chemical and life science industries with businesses including agriculture, biotechnology, chemistry, biology, materials science, and manufacturing. Matthew Mooney, the plaintiff, is an individual investor residing in Greenwich, Connecticut.

On December 18, 2014, DuPont filed an SEC Form 10, announcing the spinoff of its performance chemicals division into Chemours. DuPont's performance chemicals division consisted of fluoroproducts, titanium technologies, and chemical solutions business. According to DuPont, the spinoff of Chemours was part of "a multi-year transformation of [its] portfolio to focus on the highest potential commercial opportunities where [its] science and engineering capabilities can deliver the greatest value."[1]

Mooney alleges DuPont portrayed the Chemours spinoff as an exercise to carve out a slower growth business so DuPont could focus on higher-growth assets. Mooney contends, however, DuPont's actual purpose in the Chemours spinoff was to insulate DuPont from litigation and environmental liability, strip Chemours of

---

[1] Compl. ¶ 18.

assets at the eleventh hour via a $4 billion "midnight dividend," and establish "another corporate layer between [DuPont] and potentially debilitating risk."[2]

The litigation and environmental risk to which Mooney refers arose from DuPont's production of Perfluorooctanoic acid ("PFOA"). Under the terms of a settlement agreement in a class action lawsuit,[3] DuPont created a C8 panel to conduct studies "in communities exposed to PFOA to evaluate available scientific evidence on whether any probable link exists, as defined in the settlement agreement, between exposure to PFOA and human disease."[4] The C8 panel found several links between exposure to PFOA and various forms of cancer. In its June 30, 2015 Form 10-Q filing, DuPont noted its PFOA exposure had an accrual balance of $14 million.

On February 17, 2015, DuPont released a letter to its shareholders in which DuPont CEO Ellen Kullman said "[w]e are successfully transforming DuPont . . . . This includes the acquisitions of Danisco and Pannar Seed, as well as the sale of our Performance Coatings business and the separation of Chemours, upon completion of which we will have divested non-core, legacy business representing a total of $11 billion in annual sales in the past three years alone."[5]

---

[2] *Id.* at ¶ 6.
[3] *Id.* at ¶ 25; *see Leach v. E.I. du Pont de Nemours and Co.*, 2002 WL 1270121 (Cir. Ct. W. Va. April 10, 2002).
[4] Compl. ¶ 25.
[5] *Id.* at ¶ 7.

In a March 23, 2015 letter to shareholders, Kullman stated "DuPont's Board of Directors and management team have taken bold, decisive action over the past six years to transform the Company and deliver higher growth and higher value for our shareholders. The upcoming separation of Chemours represents our latest and most significant step on this path."[6]

In a first quarter earnings call on April 21, 2015, Nicholas Fanandakis, DuPont's CFO, stated "Chemours' capital structure at separation is expected to support a quarterly dividend to shareholders, such as the sum of DuPont's and Chemours' aggregate third quarter dividend is equivalent to DuPont's third quarterly dividend immediately prior to separation."[7] In the same call, Fanandakis stated "as we look at the capital structure of Chemours . . . I feel very good about the midnight dividend, the debt level that we are going to be able to place on the entity along with the dividend structure we are proposing."[8]

Mooney alleges he "initiated a long position in DuPont securities" on April 30, 2015, in reliance on "DuPont's representations about its upcoming Chemours Company spin-off and its business prospects thereafter."[9] Mooney extended that position on May 1, 2015. He "terminated [his] existing exposure" on May 8, 2015, but later "reestablished [a] larger DuPont long exposure" based on DuPont's

---

[6] *Id.* at ¶ 45.
[7] Pl.'s Resp. Def.'s Mot. Dismiss 13.
[8] *Id.*
[9] Compl. ¶ 14.

5

representations. Mooney "closed" his "DuPont exposure" again on May 21, 2015, but reestablished a long position on May 26, 2015.[10]

On May 27, 2015, Kullman addressed the spinoff at the Bernstein Strategic Decisions Conference.

> Well, the interesting thing is I think there was always a belief in the shareholder community and even within the company that the Performance Chemicals, high performing, low-cost, number one or number two position in each one of their franchises, generates a lot of cash throughout the cycle, returns the cost of capital even at the depths of the cycle, was, although it was commodity and cyclical, it was a very strong performer and it generated a lot of cash that enabled us to do a lot of things over the years. But so there was—I think there was a perception that it was an integral part of our company, our make-up, how we generate the cash to create those returns to shareholders and to do that.
>
> And the volatility of that segment just got very large. And so the magnitude of the change just created great dislocation. And the model became very different than the science and innovation model that the core DuPont company had. And when you have two sides of a company that are so different like that, how they create value is very different, the amount of leverage you can do is very different. Then it just seemed natural to us to have it separated and create its own company.
>
> Well, I took a look in some of the chemical industry venues that, when I became CEO, there was like Dow and DuPont, and there was [sic] a lot of small companies, right? A lot of them had been created and were

---

[10] *Id.* at ¶ 15. DuPont argues Mooney suffered no losses on most of these transactions. Def.'s Mot. Dismiss 4-7. I note that this contention, as well as DuPont's derivative position that Mooney has not adequately pleaded justifiable reliance because he did not suffer a loss on most trades, is based on assumptions of fact regarding the nature and structure of Mooney's trades and therefore cannot be considered on a motion to dismiss. *See id.* 30-33.

succeeding and doing quite well and they were –they had the capital they needed, they were making investments, they were creating shareholder value. And so the structures of the chemical industry had changed a lot in the last couple decades. And, I think Chemours is a strong franchise, and they're going to compete very effectively, and I think it's the right decision moving forward.[11]

In a June 2015 investor presentation, before the spinoff, Chemours stated it was "#1 in Fluoroproducts globally" and "its Day 1 Capitalization levels were: $200 million of cash and cash equivalents; a $1.5 billion term loan; and $2.503 billion in senior notes. Funded debt was $4.003 billion and net debt was $3.803 billion."[12] Chemours also stated it would return cash to shareholders, highlighting its $100 million dividend payable in September 2015. On June 18, 2015, Mooney extended his exposure in DuPont securities.

On July 8, 2015, DuPont filed a SEC Form 8-K, reporting it completed the Chemours spinoff on July 1, 2015. Under the basic terms of the spinoff, "DuPont common stockholders on the record date received one share of common stock of Chemours for every five shares of DuPont common stock they held on the record date."[13] On July 9, 2015, Mooney extended his exposure in DuPont and Chemours stocks.

---

[11] Compl. ¶ 48.
[12] *Id.* at ¶ 21.
[13] *Id.* at ¶ 20.

Seven days after the Chemours spinoff completion, DuPont filed the Separation Agreement between DuPont and Chemours ("Separation Agreement"). The Separation Agreement detailed the spinoff's allocation of environmental litigation risk between DuPont and Chemours. Mooney contends the effect of the allocation is to insulate DuPont from liability associated with the PFOA litigation. The Separation Agreement provided:

> With respect to existing matters . . . or new matters, in each case, . . . the DuPont Group shall, in its reasonable determination determine whether such Environmental Liabilities are Primarily associated with the Chemours business, the Chemours Group or Chemours Discontinued Operations. . . . The burden of proof to rebut such determination shall be borne by the Chemours Group.[14]

On July 8, 2015, Bloomberg reported U.S. District Judge Edmund Sargus eliminated the plaintiffs' burden of proving individual exposure to PFOA during the PFOA litigation, thereby eliminating a significant litigation barrier for PFOA plaintiffs.

Meanwhile, DuPont noted in its June 30, 2015, Form 10-Q that it received a dividend from Chemours in May 2015 (the "midnight dividend") of $3.923 billion, consisting of $3.416 billion in a cash distribution and $507 million in a distribution in-kind (ten-year notes maturing in 2025 at a 7% fixed interest rate).[15] Chemours financed the dividend by issuing $4 billion of debt; $1.5 billion under a seven-year

---

[14] *Id.* at ¶ 28.
[15] *Id.* at ¶ 24.

senior secured loan facility, $1.35 billion in senior unsecured notes due 2023, $750 million in senior notes due 2025, and $360 million in EUR[16] senior unsecured notes due 2023.

According to the complaint, Chemours initially stated in its June 2015 investor presentation that it would return capital to its shareholders through dividends. The complaint alleges that although Chemours paid an initial quarterly dividend, later dividends were reduced by 95% from $0.55 per share to $0.03 per share.[17] The complaint also alleges Chemours rewrote the "terms of its adjusted EBITDA to avoid violating its creditors' debt covenants."[18]

Possibly due to a combination of the abovementioned events, DuPont's stock began to decline towards the end of July 2015. Mooney terminated his exposure to DuPont and Chemours "at a significant loss" on July 20, 2015, shortly after the publication of the Separation Agreement, Judge Sargus's ruling, and the disclosure of the midnight dividend.[19] Mooney argues he was induced by false statements made by DuPont officers to invest in DuPont securities. This inducement, Mooney argues, resulted in increased exposure to DuPont which caused significant loss to him when he sold his DuPont securities after the stock dropped in price.

---

[16] Euro banknotes.
[17] Compl. ¶ 52.
[18] *Id.* at ¶ 53.
[19] *Id.* at ¶ 33. DuPont points out, correctly, that the "midnight dividend" repeatedly was disclosed in pre-spinoff announcements. Def.'s Mot. Dismiss 21.

The alleged false statements by DuPont officers identified in the complaint concerned the benefits DuPont expected to receive from the Chemours spinoff as well as the expected financial prospects of Chemours. I note that each statement was couched in cautionary language and identified as a forward-looking statement.[20] DuPont moved to dismiss the complaint for failure to state a claim.

**THE PARTIES' CONTENTIONS**

The alleged misrepresentations Mooney identifies in his complaint generally fall within two categories: (1) statements regarding the expected effect of the spinoff on DuPont, and (2) statements regarding Chemours' expected financial position after the spinoff.

As to the first category, Mooney alleges the March 23, 2015 letter from Kullman misrepresents DuPont's purpose for spinning-off Chemours. Although Kullman stated the purpose was to create a higher-value company, Mooney claims Kullman knew the spinoff would not affect DuPont's growth and that she made the statement to induce investors to purchase more DuPont stock and participate in the spinoff. Mooney also contends Kullman's statement at the Bernstein conference regarding the potential for DuPont to emerge stronger and more competitive was a false narrative used to promote the spinoff. Mooney claims Kullman made the

---

[20] Compl. ¶¶ 6, 17, 18, 19; Pl.'s Resp. Def.'s Mot. Dismiss 12-17.

statement to induce investor participation in the spinoff and hide the true purpose of shifting significant litigation risk onto Chemours.

As to the category of statements relating to Chemours' financial prospects as a stand-alone company, Mooney identifies four alleged misrepresentations. First, Mooney claims Fanandakis's April 2015 call fraudulently misrepresented Chemours' ability to pay its dividends and maintain a sound financial structure. Mooney argues it is clear the statement was false when made because Chemours (i) paid its announced dividend only once and thereafter reduced dividends to shareholders by 95%; (ii) "rewrote the terms of its adjusted EBITDA" within three months of going public in order to avoid violating its creditors' debt covenants;[21] and (iii) was placed on shaky financial footing as part of DuPont's plan to dump litigation liability onto Chemours. According to Mooney, Chemours' highly leveraged capital structure was intended to leave scant assets to pay litigants in the event Chemours went bankrupt due to adverse PFOA judgments.

Mooney next identifies two of Kullman's statements at the Bernstein conference as falling within this category of misrepresentations. Mooney alleges Kullman's statement regarding her anticipation that the spinoff would produce two strong global companies was false when made because DuPont knew it was launching Chemours with a shaky capital structure that would require a reduction

---

[21] Compl. ¶ 53

in dividends and an adjusted EBITDA. Mooney further claims this statement was fraudulent because Kullman knew at the time that Chemours would be saddled with PFOA-related litigation judgments. Mooney also claims Kullman's statement at the Bernstein conference regarding her belief that Chemours was a strong franchise that could compete effectively was false for the same reasons.

Finally, Mooney claims the reports made in the Chemours June 2015 Investor Presentation were false because Chemours knew at the time it could not sustain its reported dividend rate. Mooney alleges the reported dividend was a teaser rate, as demonstrated by the fact Chemours paid the dividend only once and thereafter reduced the dividend by 95%.

In response, DuPont argues all the statements Mooney challenges were non-actionable, forward-looking statements that ultimately were proven true.[22] DuPont contends Mooney's effort to plead that the statements were known to be false when made is based on later-occurring events, rather than contemporaneous facts, and therefore constitutes fraud by hindsight, which is not recognized in Delaware. DuPont also urges dismissal on the basis that Mooney's complaint fails to state that he relied on DuPont's statements when he purchased DuPont stock and fails to link

---

[22] DuPont's briefs in support of its motion strayed at times into its contention that the performance of both DuPont's and Chemours' stock after Mooney terminated his position in the companies amounted to indisputable proof that the challenged statements were not fraudulent. This argument at best is premature; the Court can no more presume that the later performance of the stocks proves the truth of the statements than it can infer that the initial drop of the stocks' trading price is evidence of fraud.

DuPont's statements with his actions. Finally, DuPont argues Mooney fails to state how his loses were caused by DuPont's statements.

**ANALYSIS**

On a motion to dismiss, the Court must determine whether the "plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof."[23] "If [the plaintiff] may recover, the motion must be denied."[24] A court may grant the motion if "it appears to a reasonable certainty" that the plaintiff would not be entitled to relief under any set of facts that could be proved to support the claim.[25] When applying this standard, the Court accepts as true all non-conclusory, well-pleaded allegations.[26] In addition, "a trial court must draw all reasonable factual inferences in favor of the party opposing the motion."[27]

### A. The alleged misrepresentations are forward-looking statements of expectation or opinion.

In order to state a claim for common law fraud, Mooney "must plead facts supporting an inference that: (1) the defendants falsely represented or omitted facts

---

[23] *Holmes v. D'Elia*, 129 A.3d 881 (Del. 2015) (citing *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978)).

[24] *Deuley v. DynCorp Int'l, Inc.*, 2010 WL 704895, at *3 (Del. Super. Feb. 26, 2010) (citing *Parlin v. DynCorp Int'l, Inc.*, 2009 WL 3636756, at *1 (Del. Super. Sept. 30, 2009) (quoting *Spence*, 396 A.2d at 968)), *aff'd*, 8 A.3d 1156 (Del. 2010).

[25] *Fish Eng'g Corp. v. Hutchinson*, 162 A.2d 722, 724 (Del. 1960) (citing *Danby v. Osteopathic Hosp. Ass'n of Del.*, 101 A.2d 308, 315 (Del. Ch. 1953), *aff'd*, 104 A.2d 903 (Del. 1954)); *Nero v. Littleton*, 1998 WL 229526, at *3 (Del. Ch. Apr. 30, 1998).

[26] *Pfeffer v. Redstone*, 965 A.2d 676, 683 (Del. 2009).

[27] *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005) (citing *Ramunno,* 705 A.2d 1029, 1034 (Del. 1998) (citing *Solomon v. Pathe Commc'ns Corp.,* 672 A.2d 35, 38 (Del. 1996)) (other citations omitted)).

that the defendant[s] had a duty to disclose; (2) the defendants knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendants intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance."[28]  Superior Court Civil Rule 9(b) applies a heightened pleading standard for fraud claims.  "In all averments of fraud, negligence or mistake, the circumstances constituting fraud, negligence or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally."[29]

Statements of opinion and predictions about the future usually are not actionable as fraud under Delaware law.[30]  This particularly is true in the context of statements regarding management's expectations for a company's future performance.  Such statements are the softest turf on which to base a fraud claim because "[t]hey are simply statements of expectation or opinion about the future of the company and the hoped for results of business strategies."[31]  Rule 9's particularized pleading requirement ensures that a plaintiff cannot pursue a fraud claim merely because business plans did not pan out.  Rather, a plaintiff must plead circumstances permitting an inference that the defendants "were positioned to

---

[28] *Trenwick America Litigation Trust v. Ernst & Young, LLP*, 906 A.2d 168, 207 (Del. Ch. 2006).

[29] Super. Ct. Civ. R. 9(b).

[30] *Trenwick American Litigation Trust*, 906 A.2d at 209.

[31] *Id.*

know that they were making erroneous statements of material facts and had an interest in doing so."[32]

Here Mooney bases his fraud claim entirely on forward-looking, nonactionable statements. Each purportedly fraudulent statement cited in the complaint involves DuPont officers expressing their expectations for (i) the spinoff's effect on DuPont, or (ii) Chemours' financial prospects. Each statement was preceded by, or contained within, cautionary statements that management's opinion or expectation about the company's future results could differ materially from actual results. Mooney argues, however, that the statements he identifies as misrepresentations are statements of fact, rather than opinions. As support, he argues the United States Supreme Court has held that a fact is "a thing done or existing" or "[a]n actual happening."[33] The Supreme Court's reasoning does not help Mooney, however, because all the statements he identifies in his complaint refer to what management "believes" or "thinks" will happen or refer to vague goals of increased growth and value. Courts routinely hold such statements are non-actionable, forward-looking statements of opinion.[34]

---

[32] *Id.* at 211.

[33] *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1325 (2015) ("Most important, a statement of fact ("the coffee is hot") expresses certainty about a thing, whereas a statement of opinion ("I think the coffee is hot") does not.") (internal quotations omitted).

[34] *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119-1120 (10th Cir. 1997); *Trenwick America Litigation Trust v. Ernst & Young, LLP*, 906 A.2d 168, 209 (Del. Ch. 2006); *Hubbard v. Hibbard Brown & Co.*, 633 A.2d 345, 350 (Del. 1993).

**B. Mooney does not sufficiently allege the forward-looking statements were not made in good faith.**

Forward-looking statements of opinion are actionable as fraudulent only if they were known to be false when made or were made with a lack of good faith.[35] Mooney has not sufficiently pleaded, either generally or with particularity, any contemporaneous fact supporting an inference DuPont knew its statements were false when made or lacked a good faith belief in their truth. Rather, Mooney only cites events arising well after the statements were made. Specifically, Mooney argues the subsequent PFOA-litigation ruling in July 2015 is proof that Kullman's statements in March 2015 were false. He similarly contends Chemours' subsequent dividend reduction and near-breach of debt covenants is evidence that the April and June 2015 remarks were false. Both events occurred well after the statements were made. Mooney's argument amounts to nothing more than a contention that the statements must have been false or made with a lack of good faith because both companies' financial performance fell after the spinoff. This is classic "fraud by hindsight" and the absence of any contemporaneous facts permitting an inference of falsity or bad faith is fatal to Mooney's case.

---

[35] *Hubbard v. Hibbard Brown & Co.*, 633 A.2d 345, 350 (Del. 1993); *Metro Comm. Corp. BVI v. Advanced Mobilecomm Tech. Inc.*, 854 A.2d 121, 149-50 (Del. Ch. 2004); *Hewlett v. Hewlett-Packard Co.*, 2002 WL 549137, *11 (Del. Ch. April 8, 2002).

Delaware law long has held "fraud by hindsight" is non-actionable.[36]  In *Noerr v. Greenwood*, the plaintiff's claim that "disclosures relating to the market value of the Specialty shares were purposefully misleading, rest[ed] on a single fact—the significantly higher market valuation of the stock eight months after the shareholders approved the [incentive compensation] [p]lans."[37]  The Court of Chancery held that "a subsequent stock increase, without more, d[id] not prove that the [defendant] directors knew that the market value of the optioned shares would exceed the exercise price at the time they sought shareholder approval of the grant."[38]  The Court of Chancery concluded that the complaint required "some contemporaneous pleaded fact" that would indicate the directors knew the stock was undervalued.[39]  In other words, "a plaintiff may not simply contrast a defendant's past optimism with less favorable actual results and then contend that the difference must be attributable to fraud."[40]

Similarly, in *Sanders v. Devine*, the plaintiff alleged he was led to believe his preferred shares were "non-redeemable" and "perpetual in duration," and that an earlier prospectus published by Ford misled investors into believing the shares would not be redeemed.[41]  Ford subsequently cashed-out the preferred shares in

---

[36] *Noerr v. Greenwood*, 1997 WL 419633, *5 (Del. Ch. July 16, 1997).
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.* (quoting *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1223 (1st Cir. 1996)).
[41] *Sanders v. Devine*, 1997 WL 599539, *1, *8 (Del. Ch. Sept. 24, 1997)

connection with a merger. The plaintiff in *Sanders* alleged Ford's directors had a "secret plan" to strip investors of their shares at the time the prospectus was published. The Court of Chancery concluded that it could not infer Ford's intent based solely on the fact that Ford subsequently cashed-out the shares.[42]

Here, Mooney seeks to avoid the requirement of pleading contemporaneous facts by arguing DuPont knew the statements were false at the time they were made, citing *Hewlett v. Hewlett-Packard Co.*[43] In *Hewlett*, the plaintiffs alleged HP management made several false statements in connection to HP's merger with Compaq. *Hewlett*, however, factually is distinguishable; in that case, the plaintiffs—one of whom was a director of the company—alleged management possessed internal information *at the time of the challenged statements* that directly contradicted management's public statements. Mooney makes no similar contemporaneous allegations in his complaint.[44]

---

[42] *Id.* ("The mere fact that Ford cashed-out the Shares, as they were fully entitled to do, cannot now be used, without more, to infer that Ford had formed a 'secret" plan back when the Shares were first issued.").

[43] *Hewlett v. Hewlett-Packard Co.*, 2002 WL 549137 (Del. Ch. April 8, 2002).

[44] Plaintiff also relies on *Metro Comm. Corp. BVI v. Advanced Mobilecomm Tech. Inc.*, 854 A.2d 121 (Del. Ch. 2004), to suggest this Court can infer DuPont's knowledge because "something was knowable and the defendant was in a position to know it." Pl.'s Br. Op. Def.'s Mot. Dismiss 30. In *Metro*, defendant Fidelity Brazil reported to plaintiffs that "the process of obtaining permits in Brazil was going smoothly while in fact some of permits were being obtained through bribery." *Metro Comm. Corp. BVI* 854 A.2d at 130. The Court of Chancery held it could infer from the alleged facts that the defendants knew about the bribery at the time of the misrepresentations because either the defendants or their agents participated in the bribery. *Id.* Mooney's complaint contains no similar allegations of illegal conduct from which contemporaneous knowledge may be inferred.

18

DuPont raises other independent arguments in support of dismissal, namely that Mooney failed to allege reliance or damages. The Court, however, need not address those arguments because of the complaint's above-referenced insufficiencies. Moreover, unlike Mooney's inability to identify an actionable misrepresentation of fact, the other pleading deficiencies DuPont identifies likely could be cured through an amended complaint.

**C. The complaint is dismissed without leave to amend.**

In his opposition to DuPont's motion to dismiss, Mooney requests, in the event the Court grants the motion, that he be given leave to amend the complaint. In my view, granting Mooney leave to amend likely would be futile and certainly would be an inefficient use of resources. Mooney is a sophisticated, law-trained investor. DuPont filed a detailed brief in support of its motion to dismiss, identifying several deficiencies in Mooney's complaint. Rather than amending his complaint to cure those deficiencies and strengthen his claim, Mooney filed a fifty-page brief defending his claim and demonstrating an understanding of the elements of fraud and the law interpreting it. The parties went through full briefing and argument, yet Mooney did not once identify any additional allegations that might bolster his claim. Mooney's failure to identify any misstatements of fact on which he relied or any contemporaneous fact suggesting DuPont's statements were false when made are not defects easily resolved through an amended complaint. If

19

Mooney possessed such facts, he had ample opportunity to identify them. Accordingly, the complaint is dismissed with prejudice.

**CONCLUSION**

For the reasons stated above, Defendant's Motion to Dismiss is **GRANTED**.